| | |
|---|---|
| **From:** | Willis, Rachel (DHHS) |
| **Sent:** | Wed, 2 Feb 2022 16:48:21 +0000 |
| **To:** | Click, Tim (DHHS); Goad, Sarah (DHHS); LaHaine, Ann (DHHS) |
| **Subject:** | RE: Avertest d/b/a Averhealth |

Hi Tim,

Sarah and I were able to do our background research. I just want to confirm that we are still proceeding with scheduling a meeting with the MI AG's and federal AG's to get more specific information regarding this complaint.

253.     That same day, Tim Click of MDHHS wrote to his colleagues Rachel Willis,
Demetrius Starling and Wendy Campau, with the Re line "Avertest d/b/a Averhealth," stating:
"I want to say that the last time we spoke about issues with the contract, we were not at the point
where we could say that there were performance issues." Email from Tim Click, 1/31/2022, Ex.
253 at 1-2. Apparently, they were now at that point.

254.     Because of scheduling difficulties, the meeting was pushed out until March 1.

255.     Attending the meeting on behalf of MDHHS were Demetrius Starling, CSA
executive director; Rachel Willis, Director of the Bureau of Out of Home Services; Amanda
Doane, who oversaw the Averhealth contract; Sarah Goad, Manager, Foster Care, Guardianship,
and Adoption Program; and three MDHHS attorneys, Shayne Machen, special advisor to the
CSA Director; Jennifer Warner, Director of Children's Services Legal Division; and Mary
Brennan, Interim Director and Regulatory Affairs Officer of the Children's Services Legal
Division of the DHHS Bureau of Legal Affairs. From the law enforcement side, Carl Hammaker
and Zachary Smitt of the Michigan Attorney General's office and Assistant U.S. Attorney
Anthony Gentner attended. Ex. 255 at 1. No unredacted version of what occurred at the meeting
was produced with the FOIA documents,

256. Over the succeeding several days (March 2 and March 4), Ms. Warner and Messrs. Hammaker and Gentner, exchanged no fewer than seven messages with the subject "Averhealth testing." Ex. 256. All of these messages were substantively redacted as privileged in the FOIA production, except for a message from Ms. Warner to Mr. Gentner on Friday, March 4: "Anthony, [Redacted]. Thank you for pulling this together." *Id.* at 4.

**From:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>
**Sent:** Friday, March 4, 2022 4:02 PM
**To:** Gentner, Anthony (USAMIE) <AGentner@usa.doj.gov>; Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Subject:** [EXTERNAL] RE: Averhealth testing

Anthony,

MCL 15.243(1)(g)

Thank you for pulling this together.
-Jennifer

Jennifer Warner
*She/Her/Hers*
Children's Services Legal Division Director
Michigan Department of Health and Human Services
517-243-7645

### ii.    *MDHHS suddenly suspends Averhealth*

257. The next business day, Monday, March 7, MDHHS officially suspended Averhealth.

258. The following day, Ms. Warner, as well as others from MDHHS, held a conference call with Messrs. Hammaker and Gentner. Emails of 3/8/22, Ex. 258 at 2-3.

259. That same day CSA executive Director Starling wrote: "We have received guidance from Legal and the AG's office over the last couple of days to insure that we are making well informed decisions regarding Averhealth." Email from Demetrius Starling, 3/8/22, Exhibit 259 at 1.

260.    In an "Executive Briefing" sent on March 10 to MDHHS' top officials, Ms. Machen explained that the reason for the discontinuation of Averhealth's testing services was that Averhealth had been violating national accreditation standards for calibration of testing devices and, as a result, was under federal investigation for medical fraud; in addition, the suspension of Averhealth was based on the recommendation of the agency's lawyers and the state's Attorney General:

> CSA has discontinued the use of Averhealth drug testing company after receiving information from the US Attorney that Averhealth was under investigation for medical fraud. Specifically, they were not complying with national accreditation standards as it related to calibration of testing devices despite agreeing to do so in their contract with DTMB. We are working closely with Children's Services Legal Division and the Attorney General's office and following all of their recommendations. Bob Wheaton in Comms has been notified of this as well.

Email from Shayne Machen, 3/10/22, Ex. 260 at1-5. (DTMB is the Department of Technology, Management and Budget, which supports the business operations of Michigan's state agencies.[33] It is the department that entered into the state's contract with Averhealth.). Here is the relevant screenshot, from p. 5 of the above exhibit:

---

[33] https://www.michigan.gov/dtmb (accessed 11/3/22).

> "under investigation for medical fraud"

> Cases Receiving Noteworthy Media Attention
>
> - CSA has discontinued the use of Averhealth drug testing company after receiving information from the US Attorney that Averhealth was under investigation for medical fraud. Specifically, they were not complying with national accreditation standards as it related to calibration of testing devices despite agreeing to do so in their contract with DTMB. We are working closely with Children's Services Legal Division and the Attorney General's office and following all of their recommendations. Bob Wheaton in Comms has been notified of this as well.
>
> Shayne Machen, Esq.
> Special Advisor to the Children's Services Agency Director
> Michigan Department of Health and Human Services

> "not complying with national accreditation standards as it related to calibration"

261.    Another apparent factor in the decision was that, according to the Michigan Attorney General, Averhealth had manipulated its instrument settings. In an email dated March 4, 2022, three days after the meeting with attorneys from the Attorney General's office, Ms. Doane referred to "the instrument software settings that the AG talked about and said were manipulated." Email from Amanda Doane, 3/4/2012, Ex. 261 at 1.

From: Doane, Amanda (DHHS)
To: Goad, Sarah (DHHS)
Subject: FW: follow-up
Date: Friday, March 4, 2022 7:37:00 AM
Attachments: Debunking Drug Testing Myths.pptx
MDHHC-Proven Quality vs 2.pptx
MI Prosecutors Association 4.21.21.pptx

FYI.

I think these could be shared with Rachel and Shayne and up through the AG's office. These are slides they have presented at meetings with judges in the past.

In the MDHHC-Proven Quality vs 2 slide deck – on slide 6 they discuss the timeline of events from November 2020 and one thing they mention is the "perfect CAP-FDT proficiency test..." I would like to ask Averhealth for that along with their annual CAP-FDT reports. Please let me know if I cannot do this.

Also in the MI Prosecutors Association slide deck – Slide 8 reviews the CAP-FDT review from December 2020 and discusses the instrument software settings that the AG talked about and said were manipulated. The instrument settings were actually set more stringent than their SOP and Averhealth changed the software parameters to align with the SOP. In addition slides 9-11 are interesting.

Amanda

"instrument software settings that the AG talked about and said were manipulated"

This is similar to the "manipulation of instrument calibrations" that was one of the grounds on which CAP had placed Averhealth on probation. *See* Paragraph 113 above.

262.    Furthermore, the improper practices that led MDHHS and CSA to suspend Averhealth dated back to the period when the Wagner firm did its audit and before. In an email to Ms. Machen the day of the Communications Issuance announcing the suspension, Bob Wheaton, MDHHS's Public Information Officer and the individual tasked with answering media inquiries to the department,[34] said, in reference to the Wagner firm:

> How could your contractor have determined there were no issues with the AverHealth testing *when it now appears that there were issues*? Do we have

---

[34] https://www.linkedin.com/in/bob-wheaton-b569b16/ (accessed 11/3/22) (emphasis added).

concerns that the contractor didn't do an adequate job or *has some type of conflict of interest*?

Email from Bob Wheaton, 3/7/22, Ex. 262 at 1 (emphasis added) ("Wheaton email"). See the

screenshot below (yellow highlighting added):



**From:** Wheaton, Bob (DHHS) <WheatonB@michigan.gov>
**Sent:** Monday, March 7, 2022 10:26 AM
**To:** Machen, Shayne (DHHS) <MachenS@michigan.gov>
**Cc:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>
**Subject:** RE: Touch Base on Aver Health Response to Reporter

Hi Shayne,

I discussed this matter with my supervisor, Darice Darling, and there are a couple of important questions we believe we should be prepared to answer from media :

- How could your contractor have determined there were no issues with the AverHealth testing when it now appears that there were issues? Do we have concerns that the contractor didn't do an adequate job or has some type of conflict of interest?

263.     Ms. Machen's answer was not recorded. Instead, she discussed it with him in a

phone call. Email from Shayne Machen, 3/7/2022, *id.* at 1. However, it is clear from Mr.

Wheaton's question that the basis for the agency's decision went back to the period when the

Wagner firm did its investigation. So serious was the revelation of the defects in Averhealth's

testing practices that Mr. Wheaton suspected that the Wagner firm might have had "some type of

conflict of interest" in upholding Averhealth against Dr. Riley's allegations. *Id.*

### iii.     *MDHHS stops using past Averhealth test results for any purpose*

264.     Following its decision, MDHHS instructed its personnel not to use past

Averhealth test results in any fashion. According to the minutes of an Urban Directors Meeting

on March 9, 2022, MDHHS Directors were told, "We are to stop using Averhealth immediately.

… Due to happenings over the last 72 hours we must take immediate adverse action against

Averhealth. We are working to get this resolved as quickly as possible. We hope to have a new statewide provider identified asap well before the 90-day period identified." Ex. 264 at 5-6.

Due to happenings over the last 72 hours we must take immediate adverse action against Averhealth. We are working to get this resolved as quickly as possible. We

hope to have a new statewide provider identified asap well before the 90-day period identified. Each county will need to identify their own provider. If you have a provider currently it might be advantageous to enter into a 90-day agreement. Questions you may have can be sent to Demetrius.

265.    Moreover, MDHHS employees were not to use past Averhealth test results as the basis of any decision, even in part; they were not to introduce them in court; and CSA was not even to report that a client had failed to show up for a test if it was an Averhealth test. Previously, failure to show up for a test had been used as an indication of the individual's lack of cooperation. Moreover, absent contrary court order, if an Averhealth test result was the only evidence of substance abuse or an abuse/neglect allegation, the CSA petition against the parents was to be dropped. Pending Case Guidance, Ex. 265-A; email from Vera Bushinski, 3/25/22, Ex. 265-B (transmitting the guidance). Here are sample instructions:

> **Preliminary Hearings and Original Termination**
>
> - MDHHS testimony should be focused on substance abuse screen results provided by facilities other than Averhealth.
> - Parents' admissions of substance abuse will be used.
> - Averhealth screens already provided will be disregarded and parents will be directed to an independent screening facility instead.
> - The petition should be withdrawn for any case where Averhealth screen results and/or Averhealth witnesses would be the only evidence used during trial to substantiate substance use or an abuse/neglect allegation unless the Court has ordered the agency to file the petition. If there are independent child abuse and neglect allegations the petition may be filed addressing only those allegations.

> **Reports for Dispositional Review/Permanency Planning Hearings and Testimony at those Hearings**
>
> - Averhealth screen results will not be included in court reports. Missed screens will only be included in reports if the missed screens are being reported by an independent screening agency.

> iv. *MDHHS investigates the concerns that led to the suspension and reviews thousands of positive Averhealth test results*

266.    Following its announcement, MDHHS set out to further investigate the concerns that led to the suspension. In an email to CSA personnel, CSA Executive Director Demetrius Starling wrote that "additional concerns regarding testing provided by Averheath have come to our attention," and "we are not using Averhealth while we investigate the concerns that have been raised." Email from Shayne Machen, 3/11/2022, Ex. 266 at 1.

> **From:** Machen, Shayne (DHHS)
> **To:** Bushinski, Vera (DHHS)
> **Cc:** Starling, Demetrius (DHHS)
> **Subject:** Memo for Today
> **Date:** Friday, March 11, 2022 3:56:00 PM
>
> Hi Vera,
>
> Please send this out to all the County Directors and BSC Directors on behalf of Demetrius. Please label the email: Substance Use Testing Update. Thank you!
>
> Good afternoon,
>
> I want to thank you all for your efforts to adjust to the change in our drug testing procedures. It never ceases to amaze me what our workforce is capable of. I know the transition to new drug testing companies came as a surprise to many of you. I want to assure you this was not pre-planned. Many of you have questions regarding the discontinued use of Averhealth drug testing. I'm writing to share with you that additional concerns regarding testing provided by Averhealth have come to our attention. Out of an abundance of caution, we are not using Averhealth while we investigate the concerns that have been raised. We ask for your patience as we work through the details. We will provide you with information as it becomes available.
>
> Very Sincerely,
>
> Demetrius Starling

> "additional concerns regarding testing provided by Averheath have come to our attention."

267. As described above, MDHHS requested and, on March 25, 2022, received documents from CAP showing that CAP had found that Dr. Riley's allegations were substantiated.

268. In April, "to ensure fair outcomes for children and families," CSA undertook an enormous project to review every one of the thousands of open cases with a positive Averhealth test result. To carry out this review, CSA created a Sharepoint website to store and record information on every open case with a positive Averhealth result. Relevant portions of his message to private agencies are shown below:



In an effort to ensure each case is reviewed, the Department created a SharePoint Database to track each case review. The SharePoint site includes a record of every open case where a positive Averhealth test result was uploaded into the Averhealth Portal. These cases are organized by county and will soon also be organized by private agency. To get access to this site, each agency must send

Thank you for you efforts to ensure careful review of each case. We believe this level of review is necessary to ensure fair outcomes for children and families. If you have questions about this

request, please send those requests to my Special Advisor, Shayne Machen.

Very Sincerely,

Director Starling

Email from Amanda Doane (with message signed by CSA Executive Director Demetrius Starling), Ex. 268 at 1-2.[35]

269.    The information to be recorded in the database included whether, after the suspension, children were reunified with the parents they were taken from. This indicates that CSA planned to reunify children and parents if that had not already happened. Children Services

---

[35] In a previous lawsuit making similar claims of Averhealth's improper testing procedures, Averhealth identified CSA Director Starling and Ms. Doane as witnesses it might use to support its defenses. It made that designation before CSA suspended Averhealth because of improper testing procedures. *See* Defendant's Initial Disclosure in *Gonzalez v. Avertest, LLC*, No. 4:21-cv-00403 (E.D. Mo.).

Administration Case Review SharePoint User Guide, Ex. 269 at 3-6. Here is a screenshot of the information to be recorded for each case:



| | CASE INFORMATION | | | |
|---|---|---|---|---|
| **Field Name** | **Alpha/Numeric** | **Type** | **Values** | **Editable?** |
| First Name | Alpha | Free Form | 1-255 | Yes |
| Last Name | Alpha | Free Form | 1-255 | Yes |
| Date of Birth | Numeric | Date | Date | Yes |
| Ongoing Case ID | Alpha | Fixed | 1-255 | No |
| Person ID | Numeric | Free Form | 1-255 | Yes |
| Case Status | Alpha | Drop Down | Open / Closed | Yes |
| Case Type | Alpha | Fixed | Investigation/Ongoing/Permanent Ward | No |
| Children Reunified<br><br>Have all children in the case been reunified with the parent(s) they were removed from? | Alpha | Drop down | Yes / Now | Yes |
| Legal Status | Alpha | Free Form | 1-255 | Yes |
| Direct or PAFC | Alpha | Drop Down | Direct / PAFC | Yes |
| Responsible County | Alpha | Drop Down | 83 County Listing | Yes |
| Averhealth District | Alpha | Fixed | 1-255 | No |
| Averhealth County | Alpha | Drop Down | 83 County Listing | Yes |
| Petition Authorization Reason<br><br>Please list all the reasons the court noted the petition was authorized. | Alpha | Free Form | 1-64,000 | Yes |
| Date of Next Hearing | Numeric | Date | Date | Yes |
| Type of Next Hearing Scheduled | Alpha | Free Form | 1-255 | Yes |
| Averhealth Entry Date | Numeric | Fixed | Date | No |
| Last Positive Test | Numeric | Date | Date | Yes |
| Ongoing Case First Name | Alpha | Fixed | 1-255 | No |
| Ongoing Case Last Name | Alpha | Fixed | 1-255 | No |
| Ongoing CSE In Care | Numeric | Fixed | 1-7 | No |
| Notes<br><br>Please include any other information that if relevant to your review or decision making. | Alpha/Numeric | Free Form | 1-64,000 | Yes |

*"Have all children in the case been reunified with the parent(s) they were removed from?"*

270.     According to an analysis done to prepare for this project,[36] there were more than 11,000 records of cases with positive results in the database. Email from Michael Rosenberg, 3/29/2022, Ex. 270 at 2-3. This analysis shows that the review was to include all positive results going back to Averhealth's first Michigan tests in May 2019. As another indication that MDHHS considered *all* Averhealth positive results unreliable, even those before the Wagner audit, Mr. Rosenberg noted the number of children removed from their homes after May 1, 2019. All of those were to be reviewed. Email from Michael Rosenberg, 3/29/2022, *id.* at 1-2. See this table (highlighting in original):

"Records with positive tests: 11,112"

| SUMMARY OF AVERHEALTH DATA LOAD | COUNT | PERCENT | NOTE |
|---|---|---|---|
| TOTAL RECORDS | 16,391 | | |
| RECORDS WITH POSITIVE TESTS | 11,112 | 67.8% | OF TOTAL RECORDS |
| RECORDS WITH POSITIVE TESTS WITH MATCHING PERSON (NAME, DOB) | 9,333 | 84.0% | OF RECORDS WITH POSITIVE TESTS |
| MATCHING RECORDS WITH MATCHING CASE PARTICIPANT ON CASE | 9,103 | 81.9% | OF RECORDS WITH POSITIVE TESTS |
| PERSON ID MATCHES CASE REFERENCE PERSON ON CASE | 6,646 | 59.8% | OF RECORDS WITH POSITIVE TESTS |
| | | | |
| CASE SUMMARY | COUNT | PERCENT | NOTE |
| TYPES OF CASES | | | |
| CPS ONGOING | 7,687 | 84.4% | OF CASES |
| INVESTIGATIONS* (Investigations were linked to Ongoing Case where Possible) | 1,407 | 15.5% | OF CASES |
| PERMANENT WARD | 9 | 0.1% | OF CASES |
| | 9,103 | | |
| | | | |
| SUMMARY OF COUNTY INFORMATION | COUNT | PERCENT | NOTE |
| RECORDS WHERE COUNTY WAS IDENTIFIED ON AVERHEALTH SHEET | 10,640 | 95.8% | OF RECORDS WITH POSITIVE TESTS |
| RECORDS WHERE CASE COUNTY MATCHED AVERHEATLH SHEET | 7,818 | 73.5% | OF RECORDS WITH AVERHEALTH COUNTY WAS LISTED |
| | | | |
| RECORDS WHERE CASE COUNTY WAS NOT FOUND OR MATCHED AVERHEALTH | 3,294 | 29.6% | OF RECORDS WITH POSITIVE TESTS |
| PROJECTED NUMBER OF UNIQUE CASES FROM UNMATCHED CASES | 2835 | 86.1% | PERCENT OF TOTAL CASES BEING UNIQUE |
| | | | |
| UNIQUE CASES FOUND | 7834 | | |
| | | | |
| UNIQUE CASES WHERE AT LEAST ONE CHILD IS IN OUT OF HOME CARE | 1536 | 19.6% | OF TOTAL UNIQUE CASES |
| CHILDREN CURRENTLY IN OUT OF HOME CARE RELATED TO CASE FOUND | 2885 | 1.9% | Average Child Per case |
| CHILDREN CONNECTED TO A CASE WHOSE REMOVAL DATE WAS AFTER 5/1/2019 | 2609 | 90.4% | OF CHILDREN ON CASES WHO ARE CURRENTLY IN OUT OF HOME CARE |
| | | 0.532409 | |
| "after 5/1/2019" | | | |
| PROJECTED ADDITIONAL NUMBER OF CASES INVOLVING OUT OF HOME CARE | 556 | | NUMBERS BASED ON THE NUMBER OF UNIQUE CASES FOUND WITH |
| PROJECTED ADDITIONAL NUMBER OF UNIQUE CHILDREN IN OUT OF HOME CARE | 1044 | | CHILDREN IN OUT OF HOME CARE PER CASE |
| | | | |
| PROJECTED TOTAL CASES | 2092 | | |
| PROJECTED TOTAL CHILDREN CONNECTED TO CASE | 3653 | | |

---

[36] https://www.linkedin.com/in/michael-rosenberg-a184b05b/?trk=public_profile_browsemap_profile-result-card_result-card_full-click (accessed 11/4/2022).

271.     In other words, the concerns that led to Averhealth's suspension had not arisen only after Wagner endorsed Averhealth's procedures.

### v.     CSA scrambles to find substitute testing services

272.     The sudden discontinuation of Averhealth's services on March 7, 2022, left CSA staff and others scrambling to find substitute testing services. In 81 of the 83 Michigan counties, Forensic Fluids Laboratory ("FFL") was selected. FFL conducted training webinars for more than 1,500 MDHHS Caseworkers on "How to Collect." Email from Amanda Doane, 4/18/22, Ex. 272 at 1.

Good Morning Drug Screen Coordinators,

I hope you are all doing well and I wanted to thank each of you for the unexpected workload during the shift away from Averhealth during this 90-day pause. As most of you know, 81 of 83 counties are now utilizing Forensic Fluids for some or all of their oral fluid drug testing needs. Forensic Fluids has given me the following statistics that are as of last Thursday:

- 81 Counties are onboard with FFL Services
- 1,507 Caseworkers have Attended our How to Collect Webinar
  - Webinars are live hosted and scheduled Tuesdays & Thursdays at 2pm. If you are interested in attending a webinar please contact the FFL Customer Service line at 866-492-2517 x230

273.     During the week of May 16, 2022, FFL surveyed MDHHS users to compare their experiences with the two companies. On a scale of 1-10, the overall satisfaction with Forensic Fluids was 9.3 compared to only 5.2 for Averhealth. FF Survey, Ex. 273 at 1. The score for "How much do you value the laboratory test results?" was 9.5 for Forensic Fluids compared to only 5.2 for Averhealth, again on a 1-10 scale. *Id.* at 8, 9. Here are screenshots of those results:

Results of survey given to Michigan DHHS users Week of 5/16/22. Below are the scores (average) on a 1 out of 10 scale (10 being Very Satisfied, 1 being Very Unsatisfied). We have also included the comments for each question. Forensic Fluids is proudest of our NET PROMOTER SCORE of **82** compared to that of our competitor with a NET PROMOTER SCORE of **-57**.

**What is your overall satisfaction with company services?**

| Forensic Fluids Laboratories | Averhealth |
| --- | --- |
| 9.3 / 10 | 5.3 / 10 |

**How responsive is the company to your questions and needs?**

| Forensic Fluids Laboratories | Averhealth |
| --- | --- |
| 9.5 / 10 | 5.7 / 10 |

**How satisfied are you with the company customer service team?**

| Forensic Fluids Laboratories | Averhealth |
| --- | --- |
| 9.6 / 10 | 5.8 / 10 |

**How much do you value the laboratory test results?**

| Forensic Fluids Laboratories | Averhealth |
| --- | --- |
| 9.5 / 10 | 5.2 / 10 |

274.    The Net Promotor Score mentioned in the above screenshot was the score in response to the question, "Based on your recent experience, how likely are you to recommend laboratory to other agencies or medical providers?" FFL's score indicates respondents were likely to recommend it; Averhealth's indicates the opposite for that lab. *Id.* at 1. See this screenshot:

**Based on your recent experience, how likely are you to recommend laboratory to other agencies or medical providers?**

| Forensic Fluids Laboratories | Averhealth |
| --- | --- |
| **Net Promoter Score 82** | **Net Promoter Score -57** |

89

### vi. *MDHHS extends the Averhealth suspension and then makes it permanent*

275.    On June 7, 2022, the date that the 90-day suspension of Averhealth's services expired, the suspension was extended another 90 days, until September 7, 2022. Communications Issuance 22-025 updated 6/7/2022. Ex. 275 (highlighting in original).



276.    On information and belief, CSA's investigation ultimately found that the concerns that led to the suspension were well-founded. That belief is based on the fact that on the date that the June 7 suspension was to end, September 7, 2022, CSA announced that the discontinuation of Averhealth's drug testing services would essentially be made permanent. Specifically, the suspension was continued essentially to the end of the Averhealth contract in 2024. In Communications Issuance 22-098, issued on September 7, 2022, with an "Obsolete Date" of July 1, 2024, it announced that "the updated Communications Issuance issued on June 7, 2022, which

discontinued the use of Averhealth for substance use testing, will remain in effect." The temporary suspension of Averhealth's services that began on March 7, 2022, was now permanent. MDHHS Communications Issuance 22-098, Ex. 276 (issued 9/7/2022).

| | Subject/Title | Substance Use Testing Update |
|---|---|---|
| **MDHHS** Michigan Department of Health & Human Services | Type | ☐ Informational Memorandum<br>☒ Program Instruction<br>☐ Policy Guide |
| **Children's Services Agency** | Issuance Date<br>Obsolete Date | 9/7/2022<br>7/1/2024 |
| **Communication Issuance** | Contact Name<br>Email<br>Phone | Sarah Goad<br>GoadS@Michigan.gov<br>N/A |
| **22-098** | Due Date<br>Due to | N/A<br>N/A |
| | *Distribution* | ☒ CSA Central Office Managers/Staff<br>☒ MDHHS BSC and County Directors<br>☒ MDHHS Juvenile Justice Managers/Staff<br>☒ MDHHS Child Welfare Managers/Staff<br>☒ Native American Tribes<br>☐ Office of Workforce Development and Training<br>☒ Private Agency Child Welfare Managers/Staff<br>☐ Private Residential Abuse/Neglect Managers/Staff<br>☐ Private Residential Juvenile Justice Managers/Staff<br>☐ Other: |

The Children's Services Agency (CSA) has determined that the updated Communications Issuance issued on June 7, 2022, which discontinued the use of Averhealth for substance use testing, will remain in effect. Staff must continue to access other local providers for testing going forward.

**Court Ordered Drug Testing**

Please work with clients who are court ordered to test to ensure they have the information and resources they need to comply with the court's order.

277.     In short, after conducting a thorough investigation, MDHHS fired Averhealth for the same faulty testing practices that give rise to this lawsuit.

## V.      PLAINTIFFS' EXPERIENCES

### A.      Katarzyna Foulger

278.     Beginning in December 2021, Plaintiff Foulger was ordered by the Superior Court of Maricopa County, Family Department, in connection with her divorce proceeding, to undergo

drug testing by Averhealth. The court order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Ms. Foulger treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

279.    The first such court order occurred on December 13, 2021, when Ms. Foulger was ordered by to submit to a drug test by Averhealth at her expense.

280.    Accordingly, on that same date, she reported to Averhealth's Phoenix AZ – Central location and signed a "Donor Testing Agreement," in which Averhealth promised "to competently perform" its testing services. (Exhibit 280, Doc # 1-1 [handwritten markings were on the document when Ms. Foulger received it]). Pursuant to that agreement, Ms. Foulger submitted to a drug test, for which she paid $145, by providing a hair sample to Averhealth as ordered by the court and submitted to other drug tests on later dates for which she paid.

281.    The services that Averhealth provided to Ms. Foulger occurred in Arizona, where Averhealth collected Mrs. Foulger's samples, and Missouri, where it conducted drug tests.

282.    The Averhealth facility was filthy on that date and every other occasion when she has been there, with a dirty floor and dusty surfaces. The collector did not know how to open the Ziploc bag for her hair sample and tore it in doing so. Ms. Foulger had to show him how to open the bag.

283.    On December 17, 2021, Ms. Foulger obtained a drug test of her hair on her own from an independent laboratory, Fastest Labs of Scottsdale. That test was negative for all tested substances, including cocaine and opiates.

284.    Subsequently, Ms. Foulger received two tardy, incorrect and bafflingly inconsistent results of the test that Avehealth had run on her hair sample.

285.     On January 2, 2022, at 05:24, Averhealth reported that it had received her December 13 sample on December 15, 2021, and that Ms. Foulger had tested positive for cocaine and 6-MAM, a unique metabolite of heroin. Those results were false. Ms. Foulger has never used cocaine or heroin.

286.     As noted above, Averhealth represents that it provides "next day results," a day faster than other laboratories. However, this report was provided 20 days after Ms. Foulger provided her hair sample.

287.     On January 3, 2022, the day after receiving the above false positives from Averhealth, she again arranged for an independent test on a hair sample, this time from Omega Laboratories. Like the other independent test, this one was negative, including for cocaine and opiates.

288.     Then, three days after receiving the first positive test report from Averhealth, on January 5, 2022, at 16:58, Averhealth issued a *second report* on Ms. Foulger's December 13 hair sample, with no explanation for why there were two reports on the same test. This time, it reported that Ms. Foulger had tested positive for cocaine and *negative* for 6-MAM.

289.     Although Ms. Foulger raised this inconsistency with Averhealth in a phone call, she never received an explanation for it. However, both reports are inaccurate. As noted above, she has never used cocaine or heroin (or any other illegal drug).

290.     After providing her hair sample for an independent test on January 3, 2022, as noted above, she left for a brief vacation in Sedona. There she went to the closest Averhealth facility, which was in Cottonwood, to be retested. However, the woman at that location told her that she would have to go back to Averhealth's Phoenix Central location for a retest. That

employee also told her that she could request that her hair sample be returned for independent testing; however, the woman said she would have to call the laboratory for that.

291.    Ms. Foulger could not find a phone number for Averhealth's laboratory, so she called customer service and spoke to an individual named Michael Giraldo, who told her that yes, she could obtain a return of her hair sample and advised her to ask her local center to have the lab return it.

292.    Accordingly, Ms. Foulger went to Averhealth's Phoenix Central location, where she was told she should contact the laboratory for a return of her hair sample.

293.    Again, she called customer service and got through to Mr. Giraldo. However, this time the story was different. This time he said that, although Averhealth retained other samples, such as urine, it *destroyed* all hair samples after testing. He provided no explanation for why that was or why he had purportedly given her incorrect information in the first call.

294.    Mr. Giraldo said he would ask a manager to call her to explain. No one did.

295.    On January 13, 2022, Ms. Foulger wrote Averhealth's customer service:

My name is Katarzyna Foulger. I had a drug hair follicle test done on the 13th of December 2021 and I got positive result on the 01/02/2022 first one. Then from the same hair I'm receiving second test result on the 01/05/2022 also positive but only for one drug. I've been told by your colleague that the time to test the hair in the lab is 7 to 10 days I received my one after 2.5 weeks and the second one after 3 weeks. I have to state that I don't do drugs at all and there is error in your system and error with the person who did test my hair. I called twice and talk to Michael Giraldo to request my hair sample and he gave me two different information. Also he took a notes for the manager of the facility and said he will contact me as soon as possible. And that was 01/12/2022. Today is 01/13/2022 and I still haven't heard from anyone. Tried to called numerous time and no answer. Still waiting to hear from the manager!

296.    No one from Averhealth responded to the email.

297.     On January 31, 2022, because of the positive test reported by Averhealth, the Court issued a further order for drug testing of Ms. Foulger. She was ordered to undergo random urine testing beginning on February 4, 2022, on at least a weekly basis at $10.50 per test.

298.     Every morning, Ms. Foulger was required to phone Averhealth to determine whether she must appear for testing on that day. If so, it would take an average of a half hour to drive to and from the location each way, and she spent an average of 45 minutes at Averhealth, for a total of an hour and 45 minutes per testing session on average. Contrary to the court order, Averhealth charged her $11.00 for each test.

299.     Between February 4, 2022, and April 3, 2022, Ms. Foulger had nine negative drug tests administered by Averhealth.

300.     According to the Court's guidelines, a no-show is considered a positive test. Averhealth also falsely reported that she was a no-show on two occasions during this period. This was false. She was never a no-show. Here is why:

301.     She was under an order to report for testing once a week. On Thursday, February 10, 2022, the day after she had reported for testing (and obtained a negative result), Averhealth somehow reported that she was a no-show. That was false because she had already received her test that week.

302.     Again, on Tuesday, February 15, 2022, she appeared for testing (and obtained a negative result). Nevertheless, Averhealth falsely reported her as a no-show for that week on Saturday, February 19, 2022.

303.     On her next visit, the Averhealth employee asked her if anyone from Averhealth had ever explained that she was supposed to call every day with a "PIN" number to find out if

she was supposed to come in that day. She said no, and he then printed out a PIN number for her. From then on, she was never a "no-show."

304.     Because of those two supposed no-shows, Ms. Foulger was ordered to submit to additional weekly random urine tests for two months beginning May 20, 2022.

305.     During that period, Ms. Foulger had seven negative tests, and Averhealth reported that two tests, those based on samples provided on May 30 and July 1, showed abnormal levels of creatinine.

306.     Those supposedly abnormal tests were either false positives based on Averhealth's unreliable procedures or were mistakenly not based on her samples. Ms. Foulger was taking no illegal drugs during that period (or any other period).

307.     The report on the sample collected on May 30 states that it was Ms. Foulger's sample, but that is incorrect because the time of collection shown on the report, 12:06:00 was not when she submitted her sample. She submitted her sample at 12:30 p.m., the same time as her husband, who accompanied her.

308.     Likewise, the report of the sample collected on July 1, 2022, that states that it was Ms. Foulger's sample is incorrect. The report states that the sample was collected at 12:01 p.m., but Ms. Foulger produced her sample at 12:10 p.m.

309.     After receiving the false positive creatinine test on the May 30 sample, Ms. Foulger voluntarily submitted to a urine test on June 2, 2022, at Fastest Labs of Scottsdale. That test was reported as negative on June 6.

310.     On July 7, 2022, the same day she received the false positive creatinine test on the July 1 sample, Plaintiff voluntarily submitted to a hair follicle test with D.R.S. Medical Review Service. That test was reported as negative on July 8, 2022.

311.    Because of the first inaccurate positive test results and the accusation that it meant she was an illegal drug user, Plaintiff suffered substantial emotional distress, including anxiety, stress and sleeplessness, ever since she received her first false positive result. That is especially the case because, as a result of her false positive drug test, she has had to continue to undergo drug testing and had no confidence that the results would be accurate. In addition, the false positive test result caused her to have to incur substantial legal fees in her child custody case.

312.    Ms. Foulger suffered her injuries in Arizona, where she experienced the consequences of Averhealth's false results.

**B.    David Shnitzer**

313.    Beginning in August 2019, Plaintiff Shnitzer submitted to drug tests of his hair by Averhealth as ordered by the Norfolk, Massachusetts, Probate and Family Court in his child custody case with his wife. The court order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Mr. Shnitzer treatment for any health-related condition. He is not, and never has been, Averhealth's patient.

314.    Mr. Shnitzer's first Averhealth test was based on a sample of hair that he provided at Averhealth's Lawrence, Massachusetts, location on or about August 23, 2019.

315.    The report of that test, dated August 29, 2019, showed that it was positive for cocaine with a level of 325.67 pg/mg compared to a cut-off of 100 pg/mg. This result was not accurate. Mr. Shnitzer has never consumed cocaine.

316.    The next day, August 30, 2019, Mr. Shnitzer voluntarily submitted to a drug test of his hair and toenail samples, including testing for cocaine, at an independent laboratory, Arcpoint Labs in Southboro, Mass. That test came back negative on September 5, 2019.

317.    The median half-life of cocaine in hair is 1.5 months in males.[37] In toenails, cocaine remains for 8-14 months.[38] That means that, if the Avertest result had been accurate, cocaine would have been found in the Arcpoint hair and nail samples taken one week later. Because it wasn't, the Averhealth test was inaccurate.

318.    Plaintiff next provided a hair sample taken in Averheath's Boston location on September 17, 2019. On September 19, 2019, Averhealth reported that the sample was "REJECTED" because "sample infected with lice." That report was absurd and impossible. Not only did Mr. Shnitzer not have head lice at the time, but his sample was taken from his *leg* because the Averhealth representative said he did not have enough hair on his head to take a sample.

319.    Mr. Shnitzer also submitted to testing at Averhealth's Boston location on September 23, 2019, where a hair sample was taken from his other leg. That test came back positive for cocaine.

320.    That test was not accurate. As stated above, Mr. Shnitzer has never consumed cocaine.

321.    As described above, Averhealth used improper procedures to collect Mr. Shnitzer's hair samples on the above occasions.

322.    As described above, beginning on October 16, 2019, the date that Averhealth's new collector, Gerald Carino, told him that Averhealth was changing its collection procedures and had fired most of its collection personnel, Mr. Shnitzer began writing to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the

---

[37] F Garcia-Bournissen F, Moller M, Nesterenko M, Karaskov T, Koren G., *Pharmacokinetics of disappearance of cocaine from hair after discontinuation of drug use*, 189 Forensic Sci. Int. 24 (2009) ("Garcia-Bournissen")..
[38] Markus R. Baumgartner, *Nails: an adequate alternative matrix in forensic toxicology for drug analysis?*, 6 Bioanalysis 2189 (2014).

Massachusetts Probate and Family Court, and Averhealth to report what he had observed. As also described above, Averhealth never gave him a substantive response, either directly or indirectly through his MPS officer, Scott Goldberg.

323.    Averhealth's false positive results have had a devastating impact on Mr. Shnitzer, including substantial emotional distress over being regarded as a drug user. They also caused the court to order that Mr. Shnitzer could see his two young daughters only with supervision. They caused the court to order him to undergo frequent unscheduled urine and hair drug tests until August 2020. He was called without notice at any hour of the day to report to Averhealth to provide a sample. In all, between his second "positive" result in September 2019 and August 2020, he was tested nearly 50 times. To provide those samples, he had to leave his office without notice for 1-2 hours at a time, and his work suffered as a consequence. As a result, he was demoted and sustained a large loss of income. Other than his two "positive" hair tests in August and September 2019, all of his tests were negative, including a hair test in April 2020, except for one urine test positive for marijuana (Mr. Shnitzer had a medical marijuana card at the time).

324.    Mr. Shnitzer suffered his injuries in Massachusetts, where he lost custody of his children because of Averhealth's false positive results.

### C.    Tiffani and Stephen Padilla

325.    Beginning in 2020, Plaintiffs Tiffani and Stephen Padilla underwent drug tests by Averhealth, as ordered by MDHHS. The order had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding the custody of their child, who will be designated in this lawsuit by the initials "M.P." (All children in this Amended Complaint are designated by initials). Averhealth has never provided the Paddillas treatment for any health-related condition. They are not, and never have been, Averhealth's patients.

326. Tiffani and Stephen Padilla have never taken any illegal drugs after December 19, 2019, and December 18, 2019, respectively.

327. On December 19, 2019, Tiffani got in an argument with Stephen and ran from her home with her baby M.P. in her arms. M.P. was 20 months old at the time.

328. Stephen's father John, with whom they were living, called the police. Tiffani was charged with misdemeanor fourth degree child abuse for running from the house with her child, a charge to which she pleaded guilty. She was sentenced to six months' probation.

329. The day of her arrest CPS took M.P. from the Padillas and placed him in foster care.

330. Tiffani and Stephen were so appalled by those events that they immediately stopped taking illegal drugs and have not taken them since.

331. This was not easy. They began seeing Stephen Thiele, a Certified Recovery Coach at the Grand Rapids Red Project on a weekly and later monthly basis. They were also prescribed suboxone, a medication used to treat opioid addiction.

332. Because CPS was swamped with work at the time, Catholic Charities oversaw their child custody case with the goal of reunification with M.P. The Padillas were initially given two two-hour visits with M.P. a week.

333. The Padillas were also required to undergo frequent drug tests by Averhealth in early 2020. For example, from February 24, 2020, to January 13, 2022, Tiffani underwent 163 tests, or one every 4.2 days on average. Of those, Averhealth reported 121, or 74%, as positive for illegal drugs, including amphetamines, methamphetamines, fentanyl (an opiate), cocaine and heroin. She in fact took none of those drugs during that time.

100

334. Similarly, from March 2, 2020 through January 18, 2022, Stephen Padilla undertook 164 Averhealth tests, or one every 4.2 days on average. Averhealth reported 134 tests, or 82%, were positive for illegal drugs such as amphetamines, methamphetamines, and fentanyl.

335. Because of those false positive results, MDHHS did not allow the Padillas to reunify with M.P. and, in fact, they lost their visitation rights. Tiffani has not been allowed to see M.P. for over two years, and Stephen has not been allowed to see M.P. for a year.

336. Since the State of Michigan discontinued the use of Averhealth's drug testing services on March 7, 2022, and went to alternative testing services, the Padillas' tests have been uniformly negative for illegal drugs.

337. The Padillas knew that Averhealth was not conducting its tests properly. To prove that that was so, in early 2021 they began taking independent drug tests on the same days that they were given Averhealth tests. The independent tests all came back negative. They have not had a positive independent test result for an illegal drug.

338. However, as described above, MDHHS would only accept Averhealth results at the time, on the false belief that Averhealth's tests were accurate.

339. Then, on January 20, 2021, Tiffani devised another method to prove that Averhealth's positive results were inaccurate. On this date, she arranged to send Averhealth pure water rather than the oral sample she generally provided. As of that date, she had been tested by Averhealth on seven occasions in the preceding month. Averhealth reported six of those tests as positive for fentanyl, an opiate, and only one as negative, even though she was not taking opiates (or any other illegal drug). This, of course, was during the period CAP was investigating Averhealth's improper testing practices, but the Padillas did not know that.

340.     Here is how Tifffani's tests were administered: On a randomly selected day, she would be instructed to report to Services of Hope in Muskegon. There she would be handed the test materials, a swabstick, a vial containing a solution, a tape to seal the vial, a slip of paper on which to write her identifying information, and, a plastic bag. Tiffani would go to a table to take her sample. She would rub the end of the swabstick on the inside of her cheek, dip it into the solution, seal the solution with the provided tape, identify herself on the paper, and seal it all in the plastic bag.

341.     The test collecting agent was supposed to observe the entire process. However, she noticed that he often did not. He was located in another room behind an open window and to observe her, he would either have to stick his head through the open window or leave his room and enter the room with Tiffani. He rarely did that.

342.     So on this occasion Tiffani dipped the swabstick in a newly opened bottle of water, specifically Great Value Purified Drinking Water. She videotaped the entire process on her phone without stopping the video, from the beginning when she described what she was about to do while sitting in her vehicle until she left the building at the end of the process.

343.     At the start of the video, she said, "Hello, my name is Tiffany Padilla. Today is January 20th, and I'm going to show you that our tests through Averhealth are being messed with. I will test, I will put my test in this new water bottle and send it. And I can't speak while I'm in there, so here we go."

344.     Set forth below are pertinent screenshots from the video. They show Ms. Padilla:

      A.     Beginning the narration while in her vehicle.

102



B.    Showing the date on her phone (the photo of a child on the phone is redacted):



Redacted

C.    Showing the water bottle:



D.     Now in the building, being given the test materials through the open window (unlike the other screenshots, this one is rotated to make clear what is shown):



E.    Sitting at the table and taking out the swabstick:



F.     Opening the new water bottle (on the audio a click can be heard as she

twists the cap):



G.    Dipping the swabstick into the water bottle:



H.     Dipping the swabstick into the vial containing solution (the vial is at the

bottom of the screenshot):



This close-up shows the stick and vial more clearly:



    I.    Sealing the vial with the provided tape:



J.      After sealing the vial, putting it into the plastic bag:



K.    Taking the test materials in the plastic bag to the window:



**L.** Handing in the plastic bag:



345. At no time during the video does Ms. Padilla place the swabstick into her mouth. Thus, what she returned for testing contained nothing more than pure water and the prefilled liquid in the vial.

346. According to Averhealth's test report, it received this sample two days later, on January 22, 2021, at 12:06 p.m. That same day it reported the results of the test as positive for fentanyl based on immunoassay, and on January 24, 2021, it reported a result of 20 nanograms per milliliter of fentanyl based on LC-MS/MS, with a cut-off of 1 ng per ml. Of course, because the sample was nothing more than pure water, this result was false and impossible. Ex. 346.

347. The day after Tiffani submitted her water test, she underwent a hair sample test through her physician at Harbour Towne Health in Muskegon. Ex. 347-A. That test was negative for all substances including all opiates. Ex. 347-B.

114

348. That negative hair test confirms that Averhealth's test on the sample collected on January 20, 2022, was fallacious. In fact, because the detection window for drugs of abuse in hair is several months,[39] the negative hair test also contradicts the positive tests by Averhealth in the month before January 20, 2021.

349. Because of the inaccurate positive test results, the accusation that they meant they were illegal drug users, and the consequent loss of custody and even contact with their son M.P., the Padillas suffered extreme emotional distress, including anxiety, stress and sleeplessness, ever since they received their first false positive result. They have had many sleepless nights and crying episodes since then. The emotional effect of the false positives made their recovery from drug addiction much more difficult. Tiffani thanks God that the stress from the false positive results didn't cause her and Stephen to go back to drugs.

350. The Padillas suffered their injuries in Michigan, where they lost custody of their son because of Averhealth's false results.

**D. Randi and Joseph Hekkema**

351. In 2020, Plaintiffs Randi and Joseph Hekkema underwent drug testing by Averhealth, as ordered by MDHHS. That testing had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided the Hekkemas treatment for any health-related condition. They are not, and never have been, Averhealth's patients.

352. Plaintiffs Randi and Joseph Hekkema had a history of illegal drug use – opiates, marijuana and cocaine – due to the stresses in their lives. However, through great effort, they succeeded in ending their addictions in early July 2020.

---

[39] ANALYTICAL AND PRACTICAL ASPECTS OF DRUG TESTING IN HAIR (PACAL KINTZ, ed.2007) at 275 (Table 13.2).

353.    Other than one relapse each, as described below, neither Randi nor Joseph Hekkema has used any illegal drug since early July 2020.

354.    Joseph Hekkema is now a substance abuse recovery coach, for which he received 40 hours of training at Fresh Coast Alliance, a recovery center in Muskegon.

355.    Since June 2022, Joseph Hekkema has been the On-Site Recovery Coach with Life Align Inc ("Life Align") on a volunteer basis. Life Align is a nonprofit substance abuse prevention organization in Muskegon Heights, Michigan.

356.    Life Align Inc. was formed in March 2022 and was granted 501(c)(3) status by the Internal Revenue Service. It opened its Community Drop-In Center in Muskegon Heights on June 24, 2022.

357.    As On-Site Recovery Coach, Mr. Hekkema has a case load of approximately 100 individuals. He organizes and conducts various activities, such as sober social events and recovery coaching. He "walks alongside" clients in their journey of sobriety. He connects them and transports them to resources such as treatment facilities and even assists them in their activities of daily living such as grocery shopping and banking.

358.    The sign shown below shows the sober activities that Mr. Hekkema runs or helps run at Life Align:



359.    In an article on Life Align accompanying a television news feature broadcast by a Grand Rapids television station on November 21, 2022, Mr. Hekkema was quoted as saying:

> "We definitely want everybody to know that there is a way out of that darkness," Joe Hekkema, Life Align's on-site recovery coach noted. "Just come on down. Talk to us anytime. We'll always walk beside you on your journey. We're caring people. We don't care what you've got going on. We're there to help you."

Charlie Tinker, "New innovative treatment program arrives in Muskegon: The peer-led substance-use recovery group meets daily" (November 21, 2022; Updated November 22, 2022.)[40]

360.    In November 2022, Joseph Hekkema began work in a second recovery coach position. He started a job as a paid Recovery Coach at Health West, one of the leading mental health facilities in Western Michigan. He is the only Recovery Coach on a Substance Use

---

[40] Available at https://www.wzzm13.com/article/news/local/muskegon/innovative-treatment-program-rebuilding-in-muskegon/69-b2a4f52a-8d28-482c-bbee-ccdc7a2ef9e2 (accessed 11/22/2022).

Disorder Team with a case load of about 35 individuals. Most of his clients have mental health issues for which they have self-medicated with drugs or alcohol. He has a wide variety of responsibilities such as assisting in connecting them to programs to help them stay sober.

361.    Randi Hekkema recently underwent the same training at Fresh Coast Alliance that Joseph undertook. She is now a volunteer Recovery Coach at Life Align. She is also employed full-time Sanford Behavioral Health in Marne, Michigan, as a paid recovery coach for women with eating disorders.

362.    The first Averhealth tests that the Hekkemas took occurred in July 2020, nearly a month after they had stopped using drugs. An individual representing the Children's Protective Services ("CPS") of MDHHS appeared at their home to take an oral saliva sample. CPS is the state agency responsible for investigating child abuse and neglect.

363.    Those tests came back from Averhealth with false positive results and, consequently, CPS removed their seven-year old son K.H. from them and allowed them to see him only for two-hour visits once a week on Sundays with supervision.

364.    They also removed Joseph's son C.R. from his care. Up to then, Joseph would see C.R. on weekends, as well as "week-on-week-offs" during the summer. C.R. also spent time with his half-brother K.H., and the two boys were very close. However, CPS terminated all of Joseph's rights to see C.R., and he has not seen C.R. since the summer of 2020. In addition, C.R. and K.H. have not been allowed to see each other, causing mental trauma and distress to K.H. and likely to C.R. as well.

365.    Randi and Joseph Hekkema were both so upset by the false positives from Averhealth and the removal of K.H. and C.R. from their care that they relapsed and took heroin. Joseph took it on August 5, 2020; Randi took it from August 5 until August 15, 2020.

366.   Joseph Hekkema had a positive Averhealth drug test on August 5, 2020, and Randi had one positive test between August 5 and August 15, 2020. Those were not inaccurate, but they are the only true positive drug tests they ever had, whether from Averhealth or another lab, since July 2020.

367.   Randi and Joseph Hekkema overcame that relapse with the intense assistance of Stephen Thiele at Fresh Coast Alliance, whom they called for help. Mr. Thiele later was one of the founders of Life Align.

368.   Randi was prescribed methadone and Joseph was prescribed suboxone to assist with their recovery.

369.   Beginning with their initial false positive tests, CPS required the Hekkemas to take randomized Averhealth drug tests on a weekly basis. Several of those tests came back with false positives for illegal drugs. They also came back positive for drugs they had been prescribed for their drug addictions and for marijuana, which was legal in Michigan. However, as another indication of the inaccuracy of Averhealth's testing, some of Randi's tests were negative for methadone even though she was taking it.

370.   On the same days they were tested by Averhealth, Joseph Hekkema voluntarily underwent drug tests by Muskegon Family Clinic, and Randi Hekkema voluntarily underwent drug tests by East Side Clinic. Those tests were all negative for illegal drugs, regardless of whether the Averhealth tests were reported as positive or negative.

371.   The Averhealth tests continued for approximately three months until, fed up by the false positives, they refused to undergo any more tests and voluntarily closed their cases with CPS. Randi's mother was given guardianship of K.H. Since then, the Hekkema's have continued

voluntary drug tests, all of which have been negative, leading Randi's mother to allow K.H. to come back into their care.

372.    Since becoming sober, the Hekkemas devote much of their Facebook pages to encouraging recovery, posting inspirational messages and tracking their own abstinence.

373.    Here are examples from Joseph Hekkema's Facebook page:

**November 15, 2020:**



Children deserve to have sober parents for Christmas

**October 30, 2020:**



Sobriety is not about giving something up. It's about taking everything back.

**February 15, 2021:**



**April 15, 2021:**



**June 21, 2021:**



**August 1, 2021:**



**June 5, 2022:**

 **Joe Hekkema**
June 5 at 6:24 AM

Today is not only my b day but marks 22 months clean for this guy! Almost 2 years since I have used opiods or stimulates or alcohol! The best 2 years I've ever have .it's crazy to think that 3 years ago I would have woken up hung over looking for pills or heroin after a long night of cocaine and whiskey. Now by the grace of God I'm up early and getting ready for breakfast clear headed! When I tell ya sober b days are the best I mean it I just thank God everyday for redeeming me eventho I am not worthy I am to him! I have my kids a beautiful home nice car and a great job all thanks to god and my program so when I tell ya we do recover and is possible with hard work dedication and faith just know i.lived it learned it and grew from it be smooth out here yall

The kids he refers to are K.H., to whom, as noted, his guardian allows Joseph access, and a baby girl born on February 17, 2022, of whom the Hekkemas have custody.

374. On October 21, 2020, after nearly three months of false positives from Averhealth, Joseph Hekkema posted a query about that company (though he misspelled its name):



375. Because of the inaccurate positive test results, the accusation that meant they were illegal drug users, and the consequent loss of custody and even contact with their children, Randi and Joseph Hekkema suffered extreme emotional distress, including anxiety, stress and sleeplessness, ever since they received their first false positive result. The emotional effect of the false positives made their recovery from drug addiction much more difficult.

376. The Hekkemas suffered their injuries in Michigan, where they lost custody of their children because of the false positive Averhealth results.

**E. Plaintiff Alexandra Hodor**

377. Beginning in late 2019, Plaintiff Alexandra Hodor underwent drug tests by Averhealth, as ordered by MDHHS. That testing had nothing to do with treatment for any health-

related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Ms. Hodor treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

378. Ms. Hodor has three sons, O.H. (whose father Joseph Ceci has abandoned him), M.H. (whose father is Michael Comilla) and A.H. (whose father is Stephen Hodor). Her experience with Avhealth was reported in an extensive article by Vice News. *See* Alice Hines, *Averhealth's Drug Tests Were Wrong Up to 30% of the Time, Former Employee Testifies* (vice.com 6/10/22).[41]

379. Ms. Hodor has not used an illegal drug since November 19, 2019.

380. Beginning on November 22, 2019, Ms. Hodor underwent a number of drug tests, based on oral samples, which were reported with false positive results of illegal drugs (as well as positive results due to prescription medications she was taking). The false positive tests caused the removal of her children to foster care. The positive results of illegal drugs that occurred before that happened included (dates refer to the dates when the samples were collected):

> 11/22/19. Positive for fentanyl, an illegal opiate, and norfentanyl, a metabolite of fentanyl.

> 11/24/2019. Positive for cocaine and benzoylecogonine, a metabolite of cocaine.

> 12/18/2019. Positive for cocaine and benzoylecogonine.

> 1/24/2019. Positive for cocaine and benzoyleogonine.

381. Those results were inaccurate. Ms. Hodor was not taking those drugs at the time.

382. The test on November 22, 2019, occurred three days after Ms. Hodor overdosed on illegal opiates, almost died, and was hospitalized. (The reason for the overdose was the stress of caring for her youngest son, M.H., who was born prematurely with many serious medical

---

[41] https://www.vice.com/en/article/n7zj3m/averhealth-drug-tests-false-results (accessed 12/27/22).

conditions. She had called a babysitter to care for her children and left home to obtain street drugs.) That overdose and near-death experience was a wake-up call that led Ms. Hodor to resolve never to take illegal drugs again, a resolve she has fulfilled.

383.     Moreover, even if she had wanted to take illegal opiates in the period following her overdose, she was too sick to do so.

384.     The positive result on the November 22, 2019 test could not have been from her overdose on November 19, 2022. The detection window for oral drug tests is 5-48 hours after consumption of the drug, as Averhealth acknowledges.[42] The November 22, 2019, oral sample was collected more than 48 hours after her overdose.

385.     Beginning on January 7, 2020, Ms. Hodor met every weekday for four weeks with Therapist Marissa Blood of Judson Center through Families First of Michigan. During these face-to-face meetings, they discussed various issues, including maintaining her sobriety through interactive worksheets and informational materials. According to a "To whom it may concern letter" by Ms. Blood, "During this time Ms. Hodor assured me she was sober and not utilizing any substances and appeared focused and determined while completing the Families First program … Ms. Hodor has shown great progress and is doing everything possible to ensure her children are well cared for."

386.     Furthermore, after the closure of the initial period of her Families First case, Ms. Blood conducted three- and six-month follow-ups in which Ms. Hodor "informed me she was still maintaining her sobriety."

---

[42] *See* https://averhealth.com/optimal-specimen-types-for-drug-testing-2/#:~:text=Disadvantages%3A%20Short%20detection%20window%20(8,of%20drug%20levels%2C%20and%20cost (accessed 12/27/222).

387.     Ms. Blood concluded: "Ms. Hodor has shown great dedication to maintaining her sobriety and properly caring for her children, she has learned substance abuse education as well as appropriate supervision techniques."

388.     Nevertheless, in February 2019, CPS filed a petition to remove Ms. Hodor's children from her. Although the petition is undated, it was filed sometime after February 13, 2019, because it refers to a Family Team Meeting on February 13, 2019.

389.     The court granted the Petition on February 20, 2020, and Ms. Hodor lost her children that day.

390.     This was during the COVID pandemic, and she was not allowed to see her children for six months, following which she had either supervised or unsupervised visitations, depending on whether there had been a (false) positive drug test.

391.     In its petition against her, CPS cited Plaintiff Hodor's positive Averhealth test results, the November 2019 overdose and an incident on January 23, 2020, in which a teacher reported that Ms. Hodor's son A.H. had said that she and a boyfriend were passed out and could not help him get to school, following which a police officer came to Ms. Hodor's home and claimed that she showed signs of intoxication. That report was false. A.H. later told Plaintiff he did not make this report to the teacher. The police officer mistook Ms. Hodor's fast talking (due to the anxiety of having a police officer arrive to inspect her home) for intoxication withdrawal. Furthermore, the incident occurred during the period covered by Ms. Blood's letter attesting to her sobriety.

392.     The principal reason behind CPS's petition for removal was the false positive Averhealth blood tests. CPS did not seek to remove Plaintiff Hodor's children following the

126

overdose (or the January incident), but rather three months later when her overdose was followed by four supposedly positive drug tests.

393.    Following the removal of her children, Ms. Hodor continued to undergo Averhealth drug tests, many of which, until MDHHS suspended Averhealth on March 7, 2022, were falsely reported as positive for illegal drugs.

394.    Because of those positive results, on a number of occasions CPS converted her unsupervised visits with her children to supervised visits.

395.    Ultimately, Ms. Hodor's son O.H. was returned to her. By informal agreement, she currently shares custody of her son A.H. with his father; she has M.H. Thursdays through Sundays. Her son A.H.'s father has full-time custody of him; by court order, she has A.H. every other weekend, but his father refuses to let her see him.

396.    The loss of her children has caused Ms. Hodor intense and sustained mental distress and emotional anguish. Her children are the most important parts of her life and their loss took away her reason for living. The turmoil caused by separating her closely bonded family has also caused mental health problems for her sons A.H and O.H. Ms. Hodor and O.H. are in therapy. A.H. suffers from depression and anxiety and has had many consequences as a result. Picking up the wreckage caused by the breakup of her family due to the false positive drug tests is the hardest thing Ms. Hodor has ever had to do. Ms. Hodor has also lost employment opportunities in the field of social work because of the test results.

397.    Ms. Hodor suffered her injuries in Michigan when she lost custody of her children because of the false positive Averhealth test results.

**F.    Plaintiff Nicole White**

398.    On January 10, 2021, in connection with proceedings for the custody of her daughters K.C. and B.C., Plaintiff Nicole White appeared at Averhealth's facility in Dartmouth

to undergo drug testing by providing a hair sample. That testing had nothing to do with treatment for any health-related condition. It was purely for the purpose of deciding child custody. Averhealth has never provided Plaintiff White treatment for any health-related condition. She is not, and never has been, Averhealth's patient.

399.    As described above, the Averhealth facility was not clean and the collector did not follow proper collection procedures.

400.    On January 16, 2020, Averhealth issued a report stating that Ms. White's sample was positive with the presence of 566.343 pg/mg of cocaine.

401.    That result was inaccurate. Ms. White has never consumed cocaine.

402.    Ms. White did not learn of this result until on or about January 24, 2020, when one of the court personnel telephoned her with it. Ms. White had previously attempted to learn the result from Averhealth, but Averhealth refused to provide it to her.

403.    When Ms. White learned of the result, she was distraught and outraged. She immediately telephoned her physician's office to tell them of this false test. The physician ordered a hair test from Franey Medical Laboratories ("Franey").

404.    Ms. White went to Franey that day for a hair test. Franey's collection procedure was much different from Averhealth's. In contrast with Averhealth, she was taken into a small, clean inner clinic room to provide the sample. No one was present but her and the collector. The collector wore gloves, brought out the scissors in a plastic bag and sanitized them before using them to take three hair samples. After cutting her hair samples, she wrapped them in foil before putting them in a plastic bag for shipping.

405.    On January 28, 2020, Omega Laboratories, to which Franey had sent her sample, reported that the test was negative for all substances, including cocaine. The screening and

confirmation cut-offs for cocaine were each 500 pg/mg, meaning that if Averhealth had been correct that her hair had 566.343 pg/mg of cocaine, the Omega test would have been positive.

406.    In addition to Averhealth's negligence, Averhealth committed deceptive and unfair practices in violation of Mass. Gen. Laws ch. 93A. Contemporaneous with filing this Amended Complaint, Ms. White is sending Avertest, LLC, a demand pursuant to that statute. If that demand does not result in a resolution of this claim, Ms. White will amend this Complaint to add a claim under ch. 93A.

407.    Prior to the Averhealth test, Ms. White had joint custody of her daughters K.C. and B.C. As a result of the false positive result, she lost joint custody and has only been allowed to see her daughters on a sporadic and infrequent basis.

408.    Because of the inaccurate positive test results, the loss of joint custody of her daughters K.C and B.C., and the inherent false accusation that she was a user of illegal drugs, Plaintiff suffered substantial emotional distress, including anxiety, depression, stress and sleeplessness.

409.    In addition, Plaintiff's daughters K.C. and B.C. have suffered substantial emotional distress and psychological damage at the loss of regular contact with their mother.

410.    Plaintiff has a younger daughter, A.T. That daughter had been devoted to her older half-sisters when they lived together and has suffered substantial emotional distress and psychological damage from their absence from her life.

411.    Ms. White suffered her injuries in Massachusetts, where she lost custody of her children because of the Averhealth false positive test result.

## VI.     COUNT I: NEGLIGENCE UNDER ARIZONA LAW (PLAINTIFF FOULGER)

412.     Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

413.     Averhealth owed Plaintiff Foulger a duty of care to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper testing and quality control methods and standards, such that the results obtained would be accurate and reliable.

414.     By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached its duty of care to Plaintiff Foulger.

415.     That breach caused Plaintiff to test positive for substances that she had not taken and thereby caused Plaintiff Foulger injury.

416.     As a result, Plaintiff Foulger suffered damages in an amount to be determined at trial.

417.     As set forth above, Averhealth knew of the consequences from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Foulger.

418.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## VII.  COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT BY MEANS OF UNFAIR PRACTICES (PLAINTIFF FOULGER)

419.    Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

420.    The actions of Defendant alleged herein violated, and continue to violate, the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 ("ACFA"), because they constitute unfair practices.

421.    The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

422.    The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under that definition.

423.    The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

424.    Plaintiff Foulger is entitled to bring this action under the ACFA because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

425.    Plaintiff Foulger entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

426. As alleged herein, Defendant Foulger committed unfair practices in violation of the ACFA by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

427. As noted above, in interpreting the ACFA, courts are to be guided by the interpretation of 15 U.S.C. § 45 (Section 5 of the F.T.C. Act) by the Federal Trade Commission and courts. The F.T.C. and courts interpret that statute to outlaw unethical practices. *See* F.T.C. Policy Statement on Unfairness. Thus, pursuant to the ACFA, Defendant has a duty not to engage in any unethical practice in connection with its testing services.

428. Averhealth's collection and testing practices are unethical under ethical standards promulgated by the American Marketing Association ("AMA"), the nation's leading marketing organization with over 38,000 members[43] and 65 professional chapters in North America, including St. Louis and Richmond, VA, where Averhealth is headquartered.[44]

429. The AMA "commits itself to promoting the highest standard of professional ethical norms and values . . . ." As such, it has published its "Statement of Ethics." *Id.* AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers . . . )." Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations."

430. The AMA's Ethical Norms state that marketers must "[e]mbrace ethical values." Accordingly, AMA has also published "Ethical Values," which represent what is "morally

---

[43] https://www.jstor.org/publisher/ama#:~:text=The%20American%20Marketing%20Association%20(AMA,in%20every%20area%20of%20marketing (accessed 8/10/2022).

[44] https://www.ama.org/ama-member-benefits/ (accessed 8/10/2022).

proper." *Id.* AMA states that marketers' Ethical Values include honesty, meaning "[h]onoring our explicit and implicit commitments and promises."

431. By not honoring its explicit and implicit commitments to perform its testing competently, to utilize accepted and appropriate protocols in collecting and analyzing her samples, including by failing to employ proper collection and quality control methods and standards as set forth herein, as well as its implicit commitment, as shown on its website, to avoid false positives, Averhealth violated this ethical value and consequently violated the unfairness prohibition of the ACFA.

432. Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

433. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

434. Defendant's unfair and unethical acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

435. WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## VIII. COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION (PLAINTIFF FOULGER)

436. Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

437.    The actions of Defendant alleged herein violated, and continue to violate, the ACFA because they constitute deception.

438.    The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

***

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

439.    The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under the statute.

440.    The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

441.    Plaintiff is entitled to bring this action under the ACFA because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

442.    Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

443.    As alleged herein, Defendant committed deception in violation of the ACFA by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

444. Pursuant to the ACFA, Defendant has a duty not to engage in any deception in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

445. Advertising the high quality and accuracy of its drug tests as set forth above and then failing to utilize accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards as set forth herein constitutes deception under the ACFA.

446. Defendant's statements advertising the high quality and accuracy of its drug tests, as set forth above, have the tendency to mislead.

447. The reason the Superior Court of Maricopa County, Family Department, required that Averhealth be the laboratory to perform drug tests on Plaintiff Foulger is that Averhealth engaged in deception in representing that it would follow accepted and appropriate collection methods and protocols in analyzing her samples, including by failing to employ proper quality control methods and standards.

448. Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

449. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Foulger in an amount to be determined at trial.

450. Defendant's deceptive acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Foulger.

451.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## IX.   COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT (PLAINTIFF FOULGER)

452.     Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

453.     The actions of Defendant alleged herein violated, and continue to violate, the ACFA because they constitute omission of a material fact.

454.     The ACFA, § 44-1522, states in relevant part:

A. The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

\*\*\*

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1).

Ariz. Rev. Stat. § 44-1522

455.     The ACFA defines "merchandise" to include services. Ariz. Rev. Stat.§ 44-1521.5. Averhealth's testing services thus constitute merchandise under the statute.

456.     The ACFA defines "person" to include any foreign corporation or company. Ariz. Rev. Stat.§ 44-1521.6. Averhealth is therefore a person under the statute.

457.     Plaintiff is entitled to bring this action under the Arizona Consumer Fraud Act because Arizona courts imply a private right of action to enforce the statute. *Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

458. Plaintiff entered into an agreement with Defendant for its drug testing services and paid for such services in Arizona.

459. As alleged herein, Defendant made omissions in violation of the ACFA, and Defendant's conduct proximately caused Plaintiff Foulger to suffer damages.

460. Pursuant to the ACFA, Defendant has a duty not to omit material facts in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

461. As set forth above, Defendant was aware of its failure to use accepted and appropriate protocols in its drug tests, including its failure to use proper collection and quality control methods and standards. Even if Defendant had been unaware of such failures, which it was not, the lack of proper quality control methods in its drug tests would have been known to it upon reasonable inquiry.

462. The failure of the use of accepted and appropriate protocols in its sample collections and drug tests is a material fact, because a reasonable consumer would likely consider it important to know, when submitting to a drug test, that the test is not conducted according to accepted and appropriate protocols.

463. Furthermore, the failure of the use of accepted and appropriate protocols in Defendant's sample collections and drug tests is also a material fact because the Superior Court of Maricopa County, Family Department would undoubtedly be induced to change its decision to require the use of Averhealth testing based on knowing that it is not conducted according to such accepted and appropriate protocols.

464. Despite Defendant's knowledge that its drug tests were not conducted according to accepted and appropriate protocols, Defendant omitted any reference of such failures to

Plaintiff Foulger and, on information and belief, the Superior Court of Maricopa County, Family Department. Plaintiff Foulger's information and belief is based on the logical principle that nobody would agree to drug tests by a laboratory that revealed that it did not use accepted and appropriate protocols.

465.     Accordingly, Defendant's provision of drug tests that were not conducted according to accepted and appropriate protocols to Plaintiff Foulger, without first disclosing the failure of its tests to employ accepted and appropriate protocols, constitutes omission of a material fact under the ACFA.

466.     Plaintiff Foulger thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious consequences from positive tests results that were improperly obtained from her samples as set forth above.

467.     Defendant's omissions have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff Foulger.

468.     Defendant's omissions in violation of the ACFA were performed willfully and wantonly, were outrageous and were done in reckless indifference to the rights of Plaintiff Foulger.

469.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## X.     COUNT V: BREACH OF CONTRACT (PLAINTIFF FOULGER)

470.     Plaintiff Foulger incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

471.     Plaintiff Foulger and Averhealth entered into a written contract dated December 13, 2021, entitled, "Donor Testing Agreement."

472.     Pursuant to that preprinted contract, Plaintiff Foulger agreed, among other things, to participate in Avertest's testing and collection process, to appear at an approved location for testing on dates to be determined and to pay a pre-determined test fee for each test, and Averhealth agreed "to competently perform" sample collection and testing.

473.     Plaintiff fully performed under the contract by appearing for sample collection when required and paying the pre-determined fee for each test.

474.     Averhealth breached the contract by failing to perform sample collection and testing competently, as set forth above.

475.     Averhealth's breach resulted in damages to Plaintiff Foulger, both actual damages in the amount she paid for testing and consequential damages in amounts to be determined.

476.     WHEREFORE, Plaintiff Foulger prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XI.     COUNT VI: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF SHNITZER)

477.     Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

478.     Averhealth owed Plaintiff Shnitzer a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

479.     By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

480.     That breach caused Plaintiff Shnitzer to test positive for substances that he had not taken and thereby caused him injury.

481.     As a result, Plaintiff Shnitzer suffered damages, in an amount to be determined at trial.

482.     As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Shnitzer.

483.     WHEREFORE, Plaintiff Shnitzer prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XII.     COUNT VII: VIOLATION OF MASSACHUSETTS' CHAPTER 93A BY MEANS OF UNFAIR PRACTICES (PLAINTIFF SHNITZER)

484.     Plaintiff Shnitzer incorporates by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further alleges as follows.

485.     The actions of Defendant alleged herein violated, and continue to violate, M.G.L. ch. 93A because they constitute unfair practices.

486.     Section 2 of ch. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. ch. 93A § 2.

487.     This section further provides:

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

Mass. Gen. Laws ch. 93A, § 2.

488.     As alleged herein, Defendant committed unfair practices in violation of ch. 93A by not using proper and accepted methods of collection and testing, and Defendant's conduct proximately caused Plaintiff Shnitzer to suffer damages.

489.     As noted above, in interpreting ch. 93A, courts are to be guided by the interpretation of 15 U.S.C. § 45 (Section 5 of the F.T.C. Act) by the Federal Trade Commission and courts. The F.T.C. and courts interpret that statute to outlaw unethical practices. *See* F.T.C. Policy Statement on Unfairness. Thus, pursuant to the ACFA, Defendant has a duty not to engage in any unethical practice in connection with its testing services.

490.     Averhealth's collection and testing practices are unethical under ethical standards promulgated by the American Marketing Association ("AMA"), the nation's leading marketing organization with over 38,000 members[45] and 65 professional chapters in North America, including St. Louis and Richmond, VA, where Averhealth is headquartered.[46]

491.     The AMA "commits itself to promoting the highest standard of professional ethical norms and values . . . .". As such, it has published its "Statement of Ethics." AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers . . . )." Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations."

492.     The AMA's Ethical Norms state that marketers must "[e]mbrace ethical values." Accordingly, AMA has also published "Ethical Values," which represent what is "morally

---

[45]https://www.jstor.org/publisher/ama#:~:text=The%20American%20Marketing%20Association%20(AMA,in%20every%20area%20of%20marketing (accessed 8/10/2022).
[46] https://www.ama.org/ama-member-benefits/ (accessed 8/10/2022).

proper." AMA states that marketers' Ethical Values include honesty, meaning "[h]onoring our explicit and implicit commitments and promises."

493.    By not honoring its explicit and implicit commitments to perform its testing competently, to utilize accepted and appropriate protocols in collecting and analyzing her samples, including by failing to employ proper collection and testing methods and procedures as set forth herein, as well as its implicit commitment, as shown on its website, to avoid false positives, Averhealth violated this ethical value.

494.    Plaintiff Shnitzer thereby suffered ascertainable loss by paying for tests that were not fair and accurate and by suffering serious emotional consequences from positive tests results that were improperly obtained from her samples.

495.    Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff Shnitzer in an amount to be determined at trial.

496.    Defendant's unfair and unethical acts and practices in violation of the ACFA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff Shnitzer.

497.    M.G.L. ch. 93A allows "[a]ny person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … [to] bring an action … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." M.G.L. ch. 93A, § 9.

498.    Plaintiff has provided a pre-suit notice and demand as required by M.G.L. ch. 93A.

499. WHEREFORE, Plaintiff Shnitzer prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIII. COUNT VIII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF TIFFANI PADILLA)

500. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

501. Averhealth owed Plaintiff Tiffani Padilla a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

502. By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

503. That breach caused Plaintiff Tiffani Padilla to test positive for substances that she had not taken and thereby caused her injury.

504. As a result, Plaintiff Tiffani Padilla suffered damages, in an amount to be determined at trial.

505. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Tiffani Padilla.

506. WHEREFORE, Plaintiff Tiffani Padilla prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIV. COUNT IX: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF STEPHEN PADILLA)

507. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

508. Averhealth owed Plaintiff Stephen Padilla a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

509. By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

510. That breach caused Plaintiff Stephen Padilla to test positive for substances that he had not taken and thereby caused him injury.

511. As a result, Plaintiff Stephen Padilla suffered damages, in an amount to be determined at trial.

512. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Stephen Padilla.

513. WHEREFORE, Plaintiff Stephen Padilla prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XV. COUNT X: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF RANDI HEKKEMA)

514. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

144

515.     Averhealth owed Plaintiff Randi Hekkema a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

516.     By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

517.     That breach caused Plaintiff Randi Hekkema to test positive for substances that she had not taken and thereby caused her injury.

518.     As a result, Plaintiff Randi Hekkema suffered damages, in an amount to be determined at trial.

519.     As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Randi Hekkema.

520.     WHEREFORE, Plaintiff Randi Hekkema prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XVI.   COUNT XI: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF JOSEPH HEKKEMA)

521.     Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

522.     Averhealth owed Plaintiff Joseph Hekkema a duty of reasonable care to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology,

145

including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

523. By failing to collect and analyze his samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

524. That breach caused Plaintiff Joseph Hekkema to test positive for substances that he had not taken and thereby caused him injury.

525. As a result, Plaintiff Joseph Hekkema suffered damages, in an amount to be determined at trial.

526. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Joseph Hekkema.

527. WHEREFORE, Plaintiff Joseph Hekkema prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XVII. COUNT XII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF ALEXANDRA HODOR)

528. Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

529. Averhealth owed Plaintiff Alexandra Hodor a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

530.     By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

531.     That breach caused Plaintiff Alexandra Hodor to test positive for substances that she had not taken and thereby caused her injury.

532.     As a result, Plaintiff Alexandra Hodor suffered damages, in an amount to be determined at trial.

533.     As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Alexandra Hodor.

534.     WHEREFORE, Plaintiff Alexandra Hodor prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XVIII. COUNT XIII: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF NICOLE WHITE)

535.     Plaintiffs incorporate by reference paragraphs 1-411 of this Amended Complaint as if fully set forth herein, and further allege as follows.

536.     Averhealth owed Plaintiff Nicole White a duty of reasonable care to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control methods and standards, such that the results obtained would be accurate and reliable.

537.     By failing to collect and analyze her samples in accordance with accepted and appropriate protocols in sample collection and toxicology, including proper quality control

methods and standards, such that the results obtained would be accurate and reliable, Averhealth breached that duty.

538. That breach caused Plaintiff Nicole White to test positive for substances that she had not taken and thereby caused her injury.

539. As a result, Plaintiff Nicole White suffered damages, in an amount to be determined at trial.

540. As set forth above, Averhealth knew of the consequences that result from inaccurate test results, and it was reasonably foreseeable that its failure to utilize appropriate collection protocols and testing methods would result in serious negative consequences for individuals who tested positive for substances that they had not taken, including Plaintiff Nicole White.

541. WHEREFORE, Plaintiff Nicole White prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## XIX. <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

## XX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray judgment against Defendant as follows:

1. Awarding actual damages against Defendant in amounts to be determined;

2. Awarding injunctive relief as permitted by law or equity, including a preliminary and permanent injunction enjoining Defendant from continuing the unlawful practices as set forth herein;

3. Awarding punitive damages against Defendant as the Court deems necessary or proper;

4. Awarding pre-judgment and post-judgment interest;

5. Awarding reasonable attorneys' fees and costs herein, as allowed by law;

6. Awarding such other and further relief as the Court deems fit and proper.

Dated: January 25, 2023          Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By:   */s/Richard S. Cornfeld*      
Richard S. Cornfeld, #31046MO
Daniel S. Levy, #66039MO
GOLDENBERG HELLER & ANTOGNOLI, P.C.
500 North Broadway, Suite 1610
St. Louis, MO 63102
rick@ghalaw.com
danny@ghalaw.com

And

Anthony S. Bruning, #30906MO
Anthony S. Bruning, Jr., #60200MO
Ryan L. Bruning, #62773MO
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

And

J.C. Pleban, MO Bar No. 63166
jc@plebanlaw.com
C. John Pleban, Mo. Bar No. 24190
cpleban@plebanlaw.com
Pleban & Associates Law, LLC
2010 South Big Bend Blvd.
St. Louis, MO 63117
(314) 645-6666 – Telephone

(314) 645-7376 – Facsimile
And

Mike Arias, #115385(CA)
Arnold Wang, #204431(CA)
Craig S. Momita #163347(CA)
Arias Sanguinetti Wang & Torrijos, LLP
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Tel: (310) 844-9696 / Fax: (310) 861-0168
mike@aswtlawyers.com
arnold@aswtlawyers.com
craig@aswtlawyers.com
(*pro hac vice* admission to be sought)

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2023, the foregoing was served by operation of the Court's electronic filing system on all counsel of record in this matter.

*/s/ Richard S. Cornfeld*

Claims - TEMP3714739

TEMP3714739 merged with HCP368999