# Exhibit E3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KATARZYNA FOULGER, DAVID )
SHNITZER, )
TIFFANI PADILLA, STEPHEN PADILLA, )
RANDI HEKKEMA, JOSEPH HEKKEMA, )
ALEXANDRA HODOR, and NICOLE WHITE, )
 )
    Plaintiffs, )
 )
v. )
 )  Case No. 4:22-CV-00878
 )
AVERTEST, LLC, dba Averhealth )
 )  JURY TRIAL DEMANDED
    Defendant. )
 )

## SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ............................................................................................ 1

II.    THE PARTIES.................................................................................................. 4

   A.  Plaintiffs ...................................................................................................... 4

   B.  Defendant .................................................................................................... 5

III.   JURISDICTION AND VENUE ....................................................................... 5

IV.   FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY ................. 6

   A.  Overview of Averhealth's Drug Testing Services ............................................ 6

      1.  Averhealth's Representations About the Accuracy and Speed of Its Testing Services.. 7

      2.  Averhealth's Recognition of the Importance of Accurate Test Results ...................... 12

   B.  Averhealth's Improper and Inaccurate Testing Services ................................... 14

      1.  Averhealth's Improper Collection Services................................................. 14

      2.  Averhealth's Improper Testing Procedures ................................................. 20

      3.  The College of American Pathologists' Support of Dr. Riley's Allegations............... 25

      4.  The State of Michigan's Suspension of Averhealth for Improper Testing Practices ... 34

         a.  MDHHS's 2021 investigation that erroneously upheld Averhealth's practices..... 38

            i.  Concerns are raised over the accuracy of Averhealth's testing, including by Michigan's judges............................................................................. 38

            ii.  MDHHS responds to the courts' concerns.......................................... 42

            iii.  MDHHS begins to investigate Averhealth .......................................... 47

            iv.  Averhealth attempts to defend itself ................................................... 48

            v.  MDHHS hires Wagner Toxicology to audit Averhealth's practices ................... 49

            vi.  Wagner issues a flawed report .......................................................... 51

            vii.  Averhealth attempts to influence MDHHS, the judges and Wagner ................... 56

            viii.  MDHHS accepts the Wagner conclusions; judges disagree ................................. 64

      b.     CSA's suspension of Averhealth for improper testing practices ............................ 67

          i.     MDHHS learns of federal and state investigations of Averhealth for medical fraud 69

          ii.    MDHHS suddenly suspends Averhealth ............................................................. 78

          iii.   MDHHS stops using past Averhealth test results for any purpose ...................... 82

          iv.   MDHHS investigates the concerns that led to the suspension and reviews thousands of positive Averhealth test results ....................................................... 84

          v.    CSA scrambles to find substitute testing services ............................................... 89

          vi.   MDHHS extends the Averhealth suspension and then makes it permanent ......... 91

V.      PLAINTIFFS' EXPERIENCES ................................................................................... 93

  A.   Katarzyna Foulger............................................................................................................ 93

  B.   David Shnitzer ................................................................................................................. 98

  C.   Tiffani and Stephen Padilla............................................................................................. 100

  D.   Randi and Joseph Hekkema ............................................................................................ 116

  E.   Plaintiff Alexandra Hodor................................................................................................ 124

  F.   Plaintiff Nicole White ...................................................................................................... 128

VI.     COUNT I: NEGLIGENCE UNDER ARIZONA LAW (PLAINTIFF FOULGER) ...... 131

VII.    COUNT II: VIOLATION OF ARIZONA CONSUMER FRAUD ACT BY MEANS OF UNFAIR PRACTICES (PLAINTIFF FOULGER) ....................................................... 132

VIII.   COUNT III: VIOLATION OF THE ACFA BY MEANS OF DECEPTION (PLAINTIFF FOULGER) ................................................................................................................. 134

IX.     COUNT IV: VIOLATION OF THE ACFA BY MEANS OF OMISSION OF A MATERIAL FACT (PLAINTIFF FOULGER) .............................................................. 137

X.      COUNT V: BREACH OF CONTRACT (PLAINTIFF FOULGER) ............................ 139

XI.     COUNT VI: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF SHNITZER) ................................................................................................................. 140

XII.    COUNT VII: VIOLATION OF MASSACHUSETTS' CHAPTER 93A BY MEANS OF UNFAIR PRACTICES (PLAINTIFF SHNITZER) ....................................................... 141

XIII.   COUNT VIII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF TIFFANI PADILLA) ................................................................................................ 144

XIV.    COUNT IX: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF STEPHEN PADILLA) ................................................................................................ 145

XV.     COUNT X: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF RANDI HEKKEMA) ................................................................................................ 145

XVI.    COUNT XI: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF JOSEPH HEKKEMA) ................................................................................................ 146

XVII.   COUNT XII: NEGLIGENCE UNDER MICHIGAN LAW (PLAINTIFF ALEXANDRA HODOR) .................................................................................................. 147

XVIII.  COUNT XIII: NEGLIGENCE UNDER MASSACHUSETTS LAW (PLAINTIFF NICOLE WHITE) ........................................................................................... 148

XIX.    COUNT XIV: VIOLATION OF MASSACHUSETTS' CHAPTER 93A BY MEANS OF UNFAIR PRACTICES (PLAINTIFF WHITE) ........................................... 149

XX.     JURY DEMAND ........................................................................................ 152

XXI.    PRAYER FOR RELIEF ............................................................................ 152

PLAINTIFFS KATARZYNA FOULGER, DAVID SHNITZER, TIFFANI PADILLA, STEPHEN PADILLA, RANDI HEKKEMA, JOSEPH HEKKEMA ALEXANDRA HODOR, and NICOLE WHITE (collectively "Plaintiffs"), file this Complaint against Defendant Avertest, LLC, d/b/a Averhealth ("Averhealth"), based on personal knowledge of each Plaintiff as to his or her own actions and on information and belief, based on counsel's investigation, as to Defendant's conduct and practices.

I.    **INTRODUCTION**

1.    Plaintiffs bring this action for damages with respect to drug tests performed by Averhealth that they underwent in connection with child custody proceedings. Averhealth did not conduct these tests according to acceptable and appropriate standards, due to its failure to follow accepted and proper procedures in collecting samples and its failure to employ proper quality control methods and other procedures in its testing. Consequently, the results it obtained from the tests on Plaintiffs were not based on proper data and science, and thus were not scientifically meaningful or accurate; to the contrary, Averhealth reported positive results on Plaintiffs, indicative of illegal drug use, even though Plaintiffs were not using illegal drugs.

2.    As Averhealth knows, individuals who submit to its drug tests depend on the tests' fairness and accuracy, and severe consequences arise when they test positive for an illegal substance. Thus, adhering to proper collection and testing standards is of the utmost importance. But as set forth herein, Averhealth failed to follow proper collection and testing methods.

3.    Plaintiffs' allegations are supported by many sources.

4.    One such source is Sarah Riley, Ph. D., Associate Professor of Pathology and Medical Director of Clinical Toxicology at Saint Louis University School of Medicine. From September to November 2020, Dr. Riley was Laboratory Director of Averhealth, with day-to-day oversight of the laboratory and responsibility for specimen testing and reporting. She saw first-

hand the inadequate testing procedures at Averhealth and resigned when management would not make corrections.

5.  Following her resignation from Averhealth, Dr. Riley submitted a complaint about its practices to the College of American Pathologists ("CAP"), Averhealth's accrediting body, in November 2020. After giving Averhealth two opportunities to respond, CAP's scientists did a thorough evaluation of Dr. Riley's four allegations and found that they were all substantiated.

6.  CAP put Averhealth on probation on January 27, 2021, because of the laboratory's unacceptable quality assurance of mass spectrometry confirmatory testing, its failure to follow procedures as written, its manipulation of instrument calibrations, and its inadequate quality control. The probation was not lifted until July 28, 2021 when Averhealth corrected its many problems. Even then, the move was made subject to continual special rigorous requirements of submitting corrective actions and evidence of Quality Control review.

7.  Those findings were not made public at the time. They were not disclosed for nearly two years until they were produced by the Michigan Department of Health and Human Services in response to Plaintiffs' counsel's Freedom of Information Act Request. However, while it was on probation, Averhealth continued to claim falsely that CAP had approved its practices and had rejected Dr. Riley's allegations. To this day, it has never disclosed that it was put on probation by CAP, much less mention the serious violations CAP found.

8.  The inadequacy of Averhealth's laboratory procedures is also recognized by the Michigan Department of Health and Human Services ("MDHHS") and its Children's Services Agency ("CSA"). Until March 7, 2022, under a $27 million five-year contract that began in May 2019, Averhealth was the laboratory they used for drug testing in child custody proceedings. The

State's Children's Protective Services ("CPS"), a part of MDHHS, would take the serious step of removing children from their parents' homes when Averhealth reported parents' positive results for illegal drugs. That happened in more than 11,000 cases, including those of Plaintiffs Tiffani and Stephen Padilla, Randi and Joseph Hekkema, and Alexandra Hodor.

9.     In March 2022, MDHHS learned that U.S. and Michigan authorities were investigating Averhealth for medical fraud based on Averhealth's years-long violation of national accreditation standards. So serious were those violations that MDHHS discontinued using Averhealth.

10.     Moreover, MDHHS's action was not only prospective. It also decided it could not – and therefore would not – use any *past* Averhealth results in any proceeding for any purpose.

11.     Because, on information and belief, Averhealth was not performing tests for MDHHS differently than in any other states, the same deficiencies affect its tests throughout the United States.

12.     Moreover, so utterly shoddy were Averhealth's testing methods that in early 2021 it unknowingly tested a sample *consisting of pure water* and erroneously reported that it contained fentanyl, an illegal opiate. As described below, video evidence proves that this was a sample of pure water and Averhealth's test report proves that it purported to find fentanyl in it.

13.     In addition, where Defendant's employees collected samples, they did not follow proper collection methods. Averhealth knew that. In or about October 2019, it fired most of its collectors in at least some parts of Massachusetts and instituted new collection methods. But that was too late for one of the Plaintiffs, David Shnitzer, who lost unsupervised contact with his children after Averhealth reported a false positive on his improperly collected sample.

14.     Defendant's actions as alleged herein breached its duty of care to follow proper collection and testing protocols, such that the tests are accurate and reliable.

15.     Plaintiffs bring this action to recover damages for the serious and sustained injuries they suffered because of Averhealth's shockingly faulty drug testing.

## II.     THE PARTIES

### A.     Plaintiffs

16.     Plaintiff Katarzyna Foulger is a resident and citizen of the State of Arizona. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods.

17.     Plaintiff David Shnitzer is a resident and citizen of the Commonwealth of Massachusetts. He tested positive for an illegal substance that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods. In the original complaint in this case, Mr. Shnitzer was identified under the pseudonym "John Doe." David Shnitzer is his real name.

18.     Plaintiff Tiffani Padilla is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

19.     Plaintiff Stephen Padilla is a resident and citizen of the State of Michigan. He tested positive for illegal substances that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

20.     Plaintiff Randi Hekkema is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

21.     Plaintiff Joseph Hekkema is a resident and citizen of the State of Michigan. He tested positive for illegal substances that he had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

22.     Plaintiff Alexandra Hodor is a resident and citizen of the State of Michigan. She tested positive for illegal substances that she had not consumed in tests conducted by Defendant Averhealth that did not follow appropriate testing protocols and methods.

23.     Plaintiff Nicole White is a resident and citizen of the Commonwealth of Massachusetts. She tested positive for an illegal substance that she had not consumed in a test conducted by Defendant Averhealth that did not follow appropriate collection and testing protocols and methods.

**B.      Defendant**

24.     Defendant Avertest, LLC, dba Averhealth ("Averhealth"), is a Virginia limited liability corporation, with its principal place of business at 2916 W. Marshall St., Suite A, Richmond, VA 23230. Its registered agent in Missouri is CSC-Lawyers Incorporating Company, 221 Bolivar Street, Jefferson City, MO 65101. It conducted the drug tests at issue in this case at its laboratory in Missouri.

**III.     <u>JURISDICTION AND VENUE</u>**

25.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because (a) there is complete diversity of citizenship in that Plaintiff Foulger is a citizen of Arizona; Plaintiffs Shnitzer and White are citizens of Massachusetts; Plaintiffs Tiffani and Stephen Padilla, Randi and Joseph Hekkema, and Alexandra Hodor are citizens of Michigan; and Defendant is a citizen of Virginia; and (b) the matter in controversy exceeds the sum or value of $75,000.

26.     This Court has personal jurisdiction over Defendant because Defendant purposefully conducts activities in the State of Missouri and the litigation "arises[] out of or relate[s] to Defendant's contacts with" Missouri. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) (internal quotation marks omitted).

27.     Specifically, as Averhealth states on its website, "[a]ll samples ship to [Averhealth's] laboratory in St. Louis," which is where it performs its tests.[1] Its laboratory is located at 4709 LaGuardia Drive, Ste. 100, St. Louis, MO 63134. Averhealth tested all of Plaintiffs' samples in that laboratory and issued its false positive reports there.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, specifically the drug testing at Defendant's laboratory in this district.

## IV.     FACTUAL ALLEGATIONS REGARDING DEFENDANT'S LIABILITY

### A.     Overview of Averhealth's Drug Testing Services

29.     Averhealth performs drug testing services to over 520,000 individuals in the United States whom, as quoted below, it calls "our clients" or simply "clients":

> "Since 1995, we have been seamlessly integrating every element of our clients' monitoring needs including collections, laboratory services, results reporting, and every step in between."[2]

> "Now, more than ever, we believe our clients should continue to be tested and that their program is evidence-based."[3]

> "We provide care that clients view as safe, trustworthy, supportive, collaborative, empowering, and empathetic. It is part of our values to treat clients with respect and dignity."

---

[1] https://averhealth.com/court-programs/ (accessed 7/15/2022) ("serving more than 550,000 active clients and 2,700 programs nationwide").
[2] https://averhealth.com/job-openings/ (accessed 1/6/2023).
[3] https://blog.averhealth.com/the-twin-pandemic (accessed 1/6/2023).

"Averhealth partners with probation, parole, pretrial supervision programs, treatment courts and social service agencies serving more than 550,000 active clients and 2,700 programs nationwide. "[45]

"2021: Averhealth has 600 employees serving more than 520,000 active clients in 34 states."[6]

These clients include individuals such as Plaintiffs who are involved in child custody proceedings. It conducts tests based on the following specimen types: urine, hair, oral fluid, and sweat. *Id*.

### 1. Averhealth's Representations About the Accuracy and Speed of Its Testing Services

30.    On its website, Averhealth repeatedly boasts about its laboratory. For example, it states that its laboratory "is **one of only 30 labs** with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT) and accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA)."[7] It adds that its laboratory "is operated by PhD-and Masters-level toxicologists." *Id*. See this screenshot:

---

[4] https://averhealth.com/clients/ (accessed 1/6/2023).
[5] https://averhealth.com/court-programs/ (accessed 12/27/2022).
[6] https://averhealth.com/about/ (accessed 1/6/2023).
[7] https://averhealth.com/our-laboratory/ (accessed 5/11/2022).



The Averhealth laboratory is one of only 30 labs within the United States with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT) and accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA). Located in St. Louis, Missouri, our laboratory is operated by PhD- and Masters-level toxicologists.

31.     It also boasts that it conducts scientifically valid and forensically defensible methodologies (*id.*):



32.     Averhealth even goes beyond touting its supposed valid methodologies to claim that it "delivers the industry's most accurate and timely testing." *Id.* (emphasis added).

8



33.    Averhealth also brags about its data and intelligence and what it calls its "most accurate and timely testing":[8]



---



34. Averhealth publicly describes the methods it claims to follow. It states that "[s]amples that initially screen positive are reflexed for a second screen using a new aliquot. The specimen is reported as positive if the reactions of the first and second tests are statistically similar." *Id*.



35. Averhealth states that these methods provide "better precision and sensitivity." *Id.*



"better precision and sensitivity"

36. Averhealth also touts its "Next Business Day Results," which it claims is a "full day faster than most lab-based testing companies."[9]



---

[9] https://averhealth.com/court-programs/ (accessed 12/27/2022).

### 2. Averhealth's Recognition of the Importance of Accurate Test Results

37.      Averhealth knows how important it is that its tests be accurate. In Averhealth's blog post entitled "Why Accurate Results Are So Important," it states that "[a]ccurate and reliable testing results are crucial" and that "there are real life implications for inaccurate tests."[10]



38.      Avertest adds that "drug test results can be a driver for incentives and sanctions" and "[w]hen those consequences … are not in line with reality due to a false positive or negative, the impact on participants can be profound. . . . [T]ests need to be accurate" *Id.*

---

[10] https://averhealth.com/why-accurate-results-are-so-important/ (accessed 5/11/2022).



39. Furthermore, Averhealth states that "one of the most potentially harmful things that can happen as a result of a false positive is the separation of parents from children. Not only does this hurt the parent, both emotionally and psychologically, but it can hurt the child even more." *Id*. (blue highlighting added).



13

### B.    Averhealth's Improper and Inaccurate Testing Services

40.    Contrary to its claim that delivers the industry's "most accurate" testing, Averhealth's test results were in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted standards.

41.    Averhealth provided inaccurate test results regarding Plaintiffs for two separate reasons.

42.    First, where it collected the samples itself, it used improper collection methods.

43.    Second, its laboratory used improper testing methods.

### 1.   Averhealth's Improper Collection Services

44.    According to the Society of Hair Testing, a worldwide network of scientists involved in drug testing in hair that has published guidance documents relating to the examination of drugs and doping agents in hair, proper collection procedures call for collection to be undertaken within a secure contamination-free facility with access restrictions in place, for the collector to wear gloves when handling hair, and for the collection kit to include foil and a collection envelope for securing the hair.[11]

45.    In addition, according to a Hair Collection Manual on the website of the National Drug & Alcohol Screening Association, a membership organization in the drug and alcohol testing industry, the shears used to cut the subject's hair "should be thoroughly sterilized" with alcohol wipes.[12]

---

[11] Gail A.A. Cooper, Robert Kronstrand and Pascal Kintz, *Society of Hair Testing guidelines for drug testing in Hair*, 218 Forensic Science International 20 (2012),

[12] https://ndasa.com/wp-content/uploads/2020/12/Hair-CollectionManual_Psychemedics.pdf (accessed 8/3/2022); *see also* David M. Ledgerwood *et al.*, *Comparison between self-report and hair analysis of illicit drug use in a community sample of middle-age men*, 33 Addict. Behav. 1131 (2008), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2495080/pdf/nihms-59586.pdf (accessed 8/3/2022), describing a hair test study for illicit drug use by scientists from Washington University in St. Louis and other universities in which "[p]recautions to avoid contamination of hair samples were taken including the interviewer wearing a head cap and the use of surgical gloves and sterilized scissors." *Id.* at 4.

46.     As Plaintiff Shnitzer observed, Averhealth did not follow these procedures. When he visited Averhealth's Lawrence and Boston facilities to provide samples, the facilities were dirty and were not secure with access restrictions in place, as required by the Society of Hair Testing.

47.     Mr. Shnitzer appeared for his first Averhealth test, on August 23, 2019, at Avertest's Lawrence, Massachusetts, facility, which was filthy. On that occasion, the collector violated a number of proper collection procedures. She cut Plaintiff Shnitzer's hair in the presence of other individuals who were laughing with her during the procedure. The collector never sterilized or sanitized her scissors. After she cut Mr. Shnitzer's hair, rather than secure the hair with foil and a sealed collection envelope, as required by the Society of Hair Testing, she stuck his hair to a piece of tape.

48.     On later occasions, Mr. Shnitzer reported to Averhealth's Boston facility to provide his samples. Until October 2019, the Boston facility was not only dirty, but it was disorganized with samples strewn around on a desk, and paperwork, gloves and other equipment scattered everywhere.

49.     On or about October 2, 2019, Mr. Shnitzer reported to Averhealth's Boston office for a urine test. There was a woman present auditing the procedures to make sure everything was done properly. She was making changes in how Averhealth collected urine and hair to assure that poor collection methods did not impair the results.

50.     Subsequently, when Mr. Shnitzer came to the Boston facility for testing, he observed that they were cleaned up and its operations were better organized.

51.     When Mr. Shnitzer reported to Averhealth's Boston location for a urine test on October 16, 2019, there was a new collector, named Gerald Carino. Mr. Carino told Mr. Shnitzer

15

that collections would now be done with additional steps to ensure accuracy. He also said that Averhealth had just fired almost everyone working in its collection centers for engaging in bad collection practices.

52.     From then on, Mr. Shnitzer did not observe problems with Averhealth's collection practices. The Boston facility, where he reported for all his subsequent tests, was then cleaner and better organized, with test samples stacked neatly in a corner and gloves and test cups arranged neatly in another.

53.     However, improper collection practices continued elsewhere in Massachusetts, as Plaintiff White observed in the Dartmouth facility in January 2020. The facility was dirty and was not secure with access restrictions in place, as required by the Society of Hair Testing. To the contrary, Ms. White was required to provide her sample in the facility's waiting room in the presence of many other people, who were laughing, talking and walking around. The Averhealth collector simply appeared with a pair of pair of scissors, which was not in a sealed container or bag, and did not sanitize or sterilize the scissors before using it; after she cut Plaintiff's hair, she secured it to tape rather than wrapping it in aluminum foil. Discovery may reveal other improper aspects of the collection procedure.

54.     Plaintiff Shnitzer reported what he observed both to the Massachusetts Probation Service ("MPS"), which was overseeing his drug testing program on behalf of the Massachusetts Probate and Family Court, and to Averhealth.

55.     On October 16, 2019, after leaving the Averhealth Boston facility, Mr. Shnitzer emailed Scott Goldberg of the MPS, the probation officer assigned to him:

> I just left Averhealth in Boston to submit my urine. A new guy was working doing the test. His name was Gerald. He informed me that the test would be done with additional steps to ensure it's done accurate. He also said Averhealth just

16

fired almost everyone working in their testing centers for inappropriate testing procedures when collecting samples.

56.     That same day, Mr. Shnitzer began writing to Averhealth to report what he had

seen. Among others, he emailed Jason Herzog, co-founder and CEO; Michele Glinn, Laboratory

Director; Ken Freedman, chief medical officer; Dominique Delagnes, Chief Operating Officer;

Jeff Herr, co-founder and Chief Information Officer; Nick Runge, Director of Operations; Justin

Manne, Director of Business Development; and Sean Shea, Business Development Director.

57.     For example, on October 16, 2019, he sent an email to Messrs. Freedman, Herr,

Herzog, Runge, and Manni, Ms. Delagnes, and Dr. Glinn. That email reads:

Averhealth leadership team,

I hope you are all doing well. My name is David Shnitzer. My PIN is [deleted]. I am currently enrolled in testing through the Norfolk Probate Court. I am going through a divorce and this is part of the current custody order.

I wanted to inform you of some bad practices I have witnessed at the Lawrence location. Along with issues from the Boston location. I was also informed today that there were a bunch of people let go from Averhealth due to how they were conducting the sample collection.

On August 23 I submitted a hair follicle test at the Lawrence location. The woman that took my sample grabbed scissors from her desk. She never sanitized them. She then cut three massive bald spots on the front of my head as she laughed with other people around us. She then stuck my sample to masking tape. Never secured the sample. Never put it in an envelope. Never had me initial it. The results came back on 8/30 positive for cocaine.

On 8/30 I went to ARCpoint labs and submitted another hair follicle and a toe nail test. Both came back negative.

The judge would not accept my tests from ARCpoint and ordered me back to Averhealth. On 9/17 I went back to Averhealth in Boston. I submitted the sample. On 9/23 we received results back. They said the sample was infected with lice. Impossible. It came from my leg.

On 9/23 I submitted a third test in Boston with Averhealth. The results came back on 9/24. Positive again for cocaine.

I have never used cocaine. These results are not accurate. I also lost my overnights with my children and now my visitation is supervised. I also was disgusted with how the samples were collected at Averhealth vs ARCpoint.

The news today about employees being let go and seeing the test center changed its procedures made me want to reach out to you. Could you elaborate on what is going on?

58.     On October 17, 2019, Mr. Shnitzer wrote back to the Averhealth Leadership team asking if they had received his email from the day before.

59.     Mr. Shnitzer received only two responses to these emails, neither of them substantive.

60.     One individual stated that she had no responsibility for the division in which the Lawrence and Boston locations are located.

61.     In addition, on October 17, Averhealth's director of operations, Nick Runge, wrote Mr. Shnitzer that Averhealth had looked into his concerns and had "provided information to our customer, Massachusetts Probation Services. Any further concerns should be addressed to your Probation Officer."

62.     Inexplicably, Mr. Runge provided no substantive information to Mr. Shnitzer. Considering that Mr. Shnitzer's concerns were with Averhealth and not the MPS, there was no apparent reason why Averhealth was unwilling to communicate with him directly.

63.     Moreover, contrary to what Mr. Runge had said, Mr. Shnitzer's probation officer, Scott Goldberg, told Mr. Shnitzer that he had received no information from Averhealth regarding these concerns.

64.     On October 23, 2019, Mr. Shnitzer again wrote Averhealth's leadership team, stating:

Averhealth leadership team,

Here are the results from my nail test done with ARCPOINT. I paid them to retest the samples at cutoff levels lower than Averhealth's 100. This is also a toe nail test with a 12 month look back vs 6 months for hair. As you can see in this test there is no cocaine present.

65.     Once again, no one responded. In all, Averhealth has never, either directly or indirectly, provided a substantive response to Mr. Shnitzer's concerns or questions. That silence continued after this lawsuit was filed.

66.     Averhealth states that its core values include treating all clients with respect, taking accountability of its actions and work, exercising honesty in all its communications, and incorporating quality and accuracy into its work:[13]



67.     The above facts show that those "core values" are a sham. As noted above, Averhealth counts Mr. Shnitzer among its clients.[14] Had it treated all clients with respect and taken accountability for its actions and work, it would have provided substantive responses to Mr. Shnitzer's concerns when he inquired. Had it exercised honesty in all of its communications, Mr. Goldberg would not have stated that he had received no response from Averhealth regarding

---

[13] https://averhealth.com/compliance/ (accessed 8/15/2022).
[14] *See* Paragraph 29, *supra.*

Mr. Shnitzer's concerns. Had Averhealth been reliable and incorporated quality and accuracy into its work, it would not have given false positives to Mr. Shnitzer and would not have provided the ludicrous rejection of his hair sample on the ground that it was infected with lice.

68.     Averhealth's improper collection procedures continued even after it improved them in its Lawrence and Boston locations, as Plaintiff Nicole White's experience attests. *See* Paragraph 53, *supra.*

69.     Similarly, as described below, Plaintiff Foulger experienced improper collection procedures in Averhealth's Arizona facilities in 2022.

### 2.     Averhealth's Improper Testing Procedures

70.     As set forth herein, significant problems with Averhealth's laboratory practices, which did not meet guidelines established by the College of American Pathologists for forensic drug testing ("CAP"), rendered the results of its tests essentially meaningless.

71.     Contrary to its claim that it delivers the industry's "most accurate" testing, Averhealth's test results were in fact riddled with inaccuracies based on comprehensive and widespread failures to follow accepted testing protocols.

72.     The facts set forth in this section are largely based on information provided by Sarah Riley, Ph. D., DABCC, FACB, a clinical chemist and toxicologist. She is Associate Professor of Pathology and Medical Director of Clinical Toxicology at Saint Louis University School of Medicine and former Assistant Professor of Pathology and Immunology at Washington University School of Medicine. In addition to toxicology, Dr. Riley has extensive training in laboratory management and quality control processes. She is a Diplomate of the American Board of Clinical Chemistry, a Fellow of the National Academy of Clinical Biochemistry, and past Chief Fellow in Clinical Chemistry, Department of Pathology and Immunology at Washington University School of Medicine. Among other awards, she has

20

received the American Association of Clinical Chemistry Outstanding Speaker Award. She is also actively involved in many professional organizations including Organization of Scientific Area Committees (OSAC), which develops quality procedure standards for the field of toxicology. She is an award-winning mass spectrometrist with international recognition.

73.     Dr. Riley has first-hand knowledge of the facts set forth in this Section of the Amended Complaint, not just because of her expertise, but because she was Laboratory Director at Averhealth from September to November 2020, where she had day-to-day oversight of the laboratory's specimen testing and reporting. Her responsibilities included daily production and quality control.

74.     Dr. Riley resigned that position because Averhealth would not change its faulty practices. Dr. Riley provided a summary of these facts in testimony in a Michigan child custody case, *In the matter of B.K and M.B.*, File No. 76442—1/2—NA (Thirtieth Judicial Circuit Mich., Family Division), (full names of minor children redacted). As described below, she also reported Averhealth's improper practices to the College of American Pathologists, Averhealth's accrediting body, which investigated and found her allegations substantiated.

75.     As set forth herein, significant problems with Averhealth's quality control practices, which did not meet guidelines established by the College of American Pathologists for forensic drug testing ("CAP"), rendered the results of its tests essentially meaningless.

76.     For an acceptable quality control scheme, samples with known concentrations, or "quality controls," should be tested alongside the patients' samples.[15] The results of these quality

---

[15] *See* Amanda Jenkins, *Forensic Drug Testing* ("Forensic") *in Principles of Forensic Toxicology* 42, 54 (Barry S. Levine and Sarah Kerrigan eds., 5th ed. 2020 (*"Principles of Forensic Toxicology"*) ("In addiction, appropriate control materials should be assayed *concurrent with client specimens* to serve as a check on the assay. Negative and positive control samples should be run *with each batch of specimens*." [emphasis added]). (Page numbers to this textbook herein are to the Kindle edition.)

21

controls should match the expected value within at least 20% for the entire run of patient samples to be scientifically acceptable.

77. Averhealth's quality controls consistently failed, yet the test results were still reported. Moreover, technical staff would manipulate data to force quality controls to be within the acceptable range. Some manipulations included changing the internal standards used and changing the regression of the calibration curve (addressed further below).

78. Furthermore, to ensure that the preparation of a sample is correct, an internal standard should be used. An internal standard is a compound that is similar to the compound of interest; thus, in toxicology, it is usually a drug with isotopes (elemental differences) distinct from the drug of interest. Notably, it is a substance not likely to occur in hair or urine being tested.

79. Internal standards are added to the sample at the beginning of the sample preparation process, and at the end of the analytical process the result of the internal standard is compared to an expected value. If the comparison is good, then the sample data can be analyzed. But if it is not a good comparison or if the internal standard is not detected, the results of the specimen analysis should not be used and the sample should be prepared again.

80. Thus, the internal standard ensures that the output numbers from the test are accurate, because the results should show the exact quantity of the internal standard placed into the test. As an example, if 5ng/ml (nanograms per milliliter) of an internal standard are put into a test, the results should show 5ng/ml of that internal standard.

81. However, Averhealth did not follow the proper process for internal standards. Instead, Averhealth used test results even where the results supposedly showed that an internal standard that was used *did not exist*.[16]

82. There were also serious problems with the calibration curves that Averhealth used for its tests.

83. As Averhealth states, "[a] quantitative test, also known as a confirmation, compares an unknown sample against a defined numerical range. The defined range is based on a calibration curve with five to seven data points. The calibration curve can give a definitive amount of a drug that is present in the sample. The interpretation of the result is not just positive or negative, but also 'how much.'"[17]

84. More specifically, a calibration curve is a series of samples with known concentrations that span a range of concentrations of a particular drug. Each calibrator would have an increasing amount of a particular drug. It should be prepared and analyzed with every batch of patient specimens. Prior to analyzing the patient specimens, the calibration curve should be analyzed for accuracy, including the coefficient of determination, which measures variance around the regression line of the curve. This is important to the accuracy of the patients' results because the regression of the curve is used to determine the concentrations of drugs in the patients' samples. Without a proper calibration curve, concentration numbers are nothing more than an educated guess.

---

[16] According to *Principles of Forensic Toxicology*, here is how the internal standard is supposed to be used: "When utilizing an internal standard, a response ratio is obtained by dividing the chromatographic area obtained from the analysis of the analyte by the chromatographic area obtained from the analysis of the internal standard." Robert D. Johnson, *Quantitative Analytical Methods in Principles of Forensic Toxicology* 220, 222-23. If the internal standard is not obtained by the analysis, the denominator of that fraction would be zero, making the result impossible.
[17] https://averhealth.com/drug-test-cutoff-levels-not-what-you-think/ (accessed 2/12/2023).

85. Averhealth frequently and consistently used calibration curves that failed to meet acceptance criteria and/or manipulated data, yet Averhealth reported the patients' results anyway. One frequent method used to manipulate data was to pull calibration curve data from runs going back days to weeks in order to find a curve that was within the acceptance criteria. It would then use this "historical" curve, which is not an acceptable practice by the CAP guidelines.[18]

86. Furthermore, quality controls should be used to verify that the calibration curve worked. For example, one quality control should be low for a particular drug and one high. If the calibration curve works, the result would show the low result and high result. However, Averhealth did not properly follow this use of quality controls to verify the calibration curves that they used in their tests.

87. In her testimony in Michigan in *B.K and M.B.*, Dr. Riley summarized her reasons for concluding that Averhealth did not follow proper laboratory methods and stated that, based on her experience, as many as 30 percent of the laboratory results that Averhealth did for the State of Michigan were false.

88. Instead of conducting its tests with proper internal standards, quality controls, and calibration curves, Averhealth prioritized the speed of its results, consistent with its above claim that it gets results faster than other companies, as well as the rapid expansion of its services, which increased from only 1,000 clients in 2013 to 100,000 in 2015, 250,000 in 2017, and more

---

[18] *Principles of Forensic Toxicology* states that the use of a historical calibration curve is acceptable only if the laboratory has verified that the calibration has not changed between batches. *Amanda J. Jenkins, Forensic Drug Testing in Principles of Forensic Toxicology* 42, 56 ("Historical calibration refers to a historical multipoint calibration curve in which the calibration is determined and then the laboratory verifies that the calibration has not changed between batches by assaying positive and negative control samples and case specimens."). The practice of using a "new calibration curve concurrently with each batch of case specimens . . . eliminates the concern day-to-day variations in analyte extraction and instrument operation that must be considered when comparing case samples to a calibration curve extracted and analyzed on a day in the past." Robert D. Johnson, *Quantitative Analytical Methods in id.* 220, at 223.

than 520,000 active clients in 2021.[19] But as Averhealth's above statements about why accurate results are so important show, speed and corporate growth should not come at the expense of proper quality control practices.

### 3. The College of American Pathologists' Support of Dr. Riley's Allegations

89. The allegations of this section are based on documents produced by the College of American Pathologists ("CAP") to the United States Department of Justice and the Michigan Department of Health and Human Services ("MDHHS") and in turn produced by MDHHS to Plaintiffs' counsel in response to a Michigan Freedom of Information Act request.

90. CAP is the body that provides Averhealth with accreditation as a forensic laboratory.

91. Following her resignation from Averhealth, Dr. Riley submitted a complaint about its practices to CAP. As summarized by CAP in a letter to Averhealth, she made four allegations:

> (1) Concern with regard to mass spectrometry confirmatory testing.
>
> (2) Failure to follow procedures as written.
>
> (3) Concerns regarding instrument calibrations.
>
> (4) Concerns regarding the review of quality control results.

Letter from Earle S. Collins, M.D., to Michele Glinn, Ph. D., 11/11/21, Ex. 91, at App. 1.[20]

92. The concerns regarding mass spectrometry "pertain[ed] specifically to how quality controls, internal standards, defined cut-off and calibration data are interpreted, prior to

---

[19] https://averhealth.com/about/ (accessed 1/9/22).
[20] All exhibits to this Amended Complaint are designated by the paragraph number where they are first cited and are included in the Appendix hereto. Cited page numbers of exhibits are to the page of the Appendix.

the release of patient results. There [were] also concerns that practice does not follow laboratory procedures." *Id.*

93.     As shown herein, CAP agreed with these allegations and, as a result, placed Averhealth on probation for six months.

94.     After receiving Dr. Riley's complaint, Earle S. Collins, M.D., Complaints and Investigations Committee Chair, CAP Accreditations Programs, wrote to Averhealth's Michelle Glinn, Ph. D., on CAP letterhead on November 11, 2020. He outlined Dr. Riley's allegations and asked for specific detailed information on its practices by November 24, 2020. *Id.*

95.     Averhealth responded to CAP's letter, but CAP found its response inadequate. Accordingly, on December 22, 2020, Lena Portillo, Investigations Analyst, CAP Accreditation Programs, wrote Dr. Glinn and asked for additional information by January 4, 2021. Ex. 95-A, App. 9-142, at App. 20-21. [21]

96.     One striking example of the problems with Averhealth's response related to its practice of using historical Quality Controls ("QCs"). In her letter to Dr. Glinn, Ms. Portillo stated that this was an example of "unacceptable practices" and called it "data manipulation to accommodate poor responses and accept runs or a patient sample without understanding why there are discrepancies." She asked for additional information regarding this practice. *Id.* at App. 20.

97.     Ms. Portillo also stated that there were instances where Averhealth's practice did not follow its written policy:

---

[21] This exhibit is a collection of documents produced to Plaintiff's counsel by the Michigan Department of Health and Human Services in response to a Freedom of Information Act Request. Other documents produced by the Department indicate that CAP had produced these documents to Amanda Doane of the Michigan Department of Health and Human Services on March 25, 2022 and that it had previously produced them to the United States Department of Justice. Ex. 95-B, App. 143-145.

For example, the policy states that the lower limit of reporting may be at or above the lowest calibrator. There are instances where the laboratory did not obtain results for calibrator 1 or 2 and reported values less than the recovered calibrator value. Additionally, the policy states that no more than 25% of the total number of data points per curve may be excluded without the director/designee review. There are instances of 3 out of 8 calibrators not being included in the curve, indicating unstable calibration.

*Id.*

98.     Dr. Glinn responded to CAP on January 4, 2021. *Id.* at App. 22-27. She not only attempted to defend Averhealth's practices, but she also bad-mouthed Dr. Riley, accusing her of "disregard[ing] the principles of ethical conduct for the toxicology profession by violating confidentiality, honesty, and personal integrity. . . ." *Id.* at App. 22. She stated that "[i]t is perplexing that Sarah Riley never once raised any concerns while working for Averhealth. . . ." *Id.*

99.     Dr. Glinn also stated that "[w]e believe that upon your review of the information enclosed herein you will arrive at a finding of Not Substantiated." *Id.* at App. 23. That expectation turned out to be far off the mark.

100.     As Ms. Portillo noted in the final CAP memorandum reviewing Averhealth's response, Dr. Glinn was not even accurate regarding whether Dr. Riley had raised any concerns before her resignation. Ms. Portillo noted drily, "This is an interesting statement, as the complainant provided the email she sent two days prior to resigning and it outlines in detail numerous quality concerns." *Id.* at App. 6.

101.     More substantively, CAP rejected Averhealth's defenses to every one of Dr. Riley's allegations and obviously disagreed with Averhealth's attempted smear that Dr. Riley had acted unethically, dishonestly, with a lack of integrity and in violation of principles of confidentiality.

102.    In a memorandum dated January 11, 2021, Ms. Portillo reviewed and evaluated Averhealth's responses to each of the allegations. Regarding Allegation #1, unacceptable quality assurance of mass spectrometry confirmatory testing, she stated "As previously discussed, I believe that this allegation is **substantiated**." *Id.* at App. 7 (emphasis in original).

103.    After discussing Allegation #2, failure to follow procedures as written, Ms. Portillo stated:

> [T]he laboratory's procedures are largely *acceptable but they are not being followed as written*. … [T]he laboratory does not appear to be following their QC and calibration policies. … [T]he laboratory is also not evaluating their survey results with a root cause analysis, as required by policy, nor do the policies address the 'magic' that is referenced in the chat transcripts provided by the complainant referencing the QC and calibrator manipulations used to report results.

*Id.* at App. 7-8 (emphasis added). She concluded, "For these reasons, and as previously discussed, I believe that this allegation is **substantiated**." *Id.* at App. 8 (emphasis in original).

104.    Regarding Allegation #3, manipulation of instrument calibrations, including the use of historical QC data, she stated, "I believe this allegation is likely **substantiated** . . . ." *Id.* at App. 8 (emphasis in original). The reason she found it "likely substantiated" rather than "substantiated" was that she did not believe she was sufficiently knowledgeable regarding the validity of Averhealth's specific use of historical data and asked Arthur Zebelman, Ph. D., CAP's Forensic Drug Testing Commissioner, to review it.

105.    Dr. Zebelman did not find the practice acceptable; in fact, he had never heard of it. He stated: "I do not understand what they mean when they say they may use historical quality control data. As I understand the phrase, which I have never seen used before, they somehow use QC data from a run different from that which they are assessing. I hope I am misunderstanding what they are suggesting." *Id.* at App. 17. But that is exactly what Averhealth was not only suggesting, but doing.

106.    Overall, Dr. Zebelman stated, "This laboratory has many quality assurance issues in the areas of quality control and proficiency testing. I believe they need to be put on probation and required to institute more thorough follow up and resolution of their QA issues." *Id.* at App. 14.

107.    Finally, regarding Allegation #4, review of quality control results, Ms. Portillo stated: "I believe this allegation is **substantiated**." *Id.* at App. 9 (emphasis in original).

108.    In summary, Ms. Portillo stated, "I suggest presentation to the Accreditation Committee for consideration of a Non Routine Inspection and/or probation." *Id.* at App. 9. The reason for the inspection was not to determine whether the laboratory was in compliance but rather to correct its faults. She stated: "I believe the laboratory needs an experienced inspector who can educate them, as they do not seem to understand the issues." *Id.*

109.    Others at CAP also noted serious deficiencies in Averhealth's practices. Barry Sample, Ph. D., agreed with Dr. Zebelman and specifically called out "[t]he imprecision and lack of quantitative accuracy," "concerns regarding the chromatic separation" and "a higher than expected variability on the immunoassay screening … for certain analytes (e.g., THC) as well as the confirmatory (LC-MS/MS) assays." *Id.* at App. 142.

110.    Joan Kosiek of CAP noted many problems, including that "[t]here [were] numerous issues with PT [Proficiency Testing], both qualitative and quantitative involving three different matrices (urine, oral fluid and hair)." *Id.* at App. 139. She also noted that the laboratory stated that review of past PT results indicate no bias even though "[a] review of the bar graphs from the past three cycles of survey challenges clearly shows bias in one direction for numerous

analytes." *Id.* (emphasis in original). In fact, she said that "the laboratory does not understand Bias." *Id.* at App. 139.[22]

111.    None of the CAP scientists expressed any disagreement with Dr. Riley's four allegations.

112.    On January 27, 2021, CAP placed Averhealth's accreditation on probation. In its letter informing Averhealth of that move, CAP stated, "This decision is based on the laboratory's lack of continuous compliance with Standard III – Quality Management, as documented during the review of documentation submitted in response to a complaint investigation." Letter of Michael B. Datto, MD, PhD, CAP Accreditation Committee chair to Michelle Glinn (with a copy to Jason Herzog, Averhealth CEO), January 29, 2021 ("Probation Letter"), Ex. 112, at App. 146.

113.    CAP found all four allegations substantiated. These were unacceptable quality assurance of mass spectrometry confirmatory testing, failure to follow procedures as written, manipulation of instrument calibrations, and review of quality control results. *Id.* The letter indicated that CAP's Accreditation Committee was "particularly concerned about the evaluation of bias and root cause analysis in regard to proficiency testing results, as well as the use of historical QC and QC acceptance practices." *Id.*

114.    The letter directed Averhealth to submit detailed documentation on the steps it was taking to correct these deficiencies. The probation was to remain in effect "until the Accreditation Committee determines that the conditions of probation have been successfully rectified." *Id.*

---

[22] "Bias" is simply another term for accuracy and refers to measurement error. Justin M. Holler and Shawn P. Vorce, "Method Validation" in *Principles of Forensic Toxicology* at 233 ("The term accuracy is often interchanged with bias to define the measurement error of a method between a known value and the measured value.")

115.     On May 13, 2021, CAP conducted a non-routine inspection of Averhealth. The inspector found that Averhealth had corrected the practices that led to its being put on probation, presumably because the inspector performed the education process that Ms. Portillo had recommended in her January 11 memo. Ex. 115 at App. 148, Letter from Earle S. Collum, M.D., to Michelle Glinn, Ph. D., 5/25/21.

116.     Nevertheless, Averhealth remained on probation for two more months. The probation was finally lifted July 28, 2021. However, in its letter dated July 29, 2021, CAP also required that Averhealth comply with the following detailed and onerous requirements:

- Submit evaluations and corrective actions for all external proficiency testing for urine, oral fluid, and hair testing to include investigation of bias.

  - o  Submission expected within 14 days of receipt of PT results, to continue until the laboratory's next routine inspection in 2022.

- Submit 2 quarters of evidence of QC review with documentation of follow-up for any QC issues.

  - o  First submission expected by October 12, 2021.
  - o  Second submission expected by January 11, 2022

Ex. 116 at App. 149-150, Letter of July 29, 2021, from Michael B. Datto, Accreditation Committee Chair to Dr. Glinn.

117.     CAP's letter also reiterated Averhealth's past serious violations with its accreditation standards that had led to this investigation:

Our investigation determined that the laboratory was out of compliance with the CAP Standards for Laboratory Accreditation with respect to the following allegations:

- Concern regarding unacceptable quality assurance of mass spectrometry confirmatory testing.

- Failure to follow procedures as written.

- Concerns regarding the manipulation of instrument calibrations.

- Concerns regarding the review of quality control results.

*Id.*

118.    Averhealth never publicly disclosed that CAP had placed it on probation for these violations. To the contrary, it dishonestly hyped its accreditation during the very period it was on probation. For example, on February 19, 2021, less than a month after it had been placed on probation, it referred to its accreditation on its website without mentioning that it had been placed on probation for flouting the very standards it claimed to follow:[23]

---

[23] https://averhealth.com/the-importance-of-lab-based-testing-for-accuracy-and-reliability/ (accessed 1/16/2023).



"2/9/21"

averhealth                    COURT SOLUTIONS    BLOG    NEWS ROOM    AVERHEA

### Reliability

02.19.21

Evidence-based drug testing practices serve a critical role in helping people to navigate the intersection of criminal justice programs and healthcare. Many courts and probation departments understand the crucial importance of random testing but choosing a substance use monitoring partner that has a reliable process and the best testing technology is just as important. Averhealth's laboratory testing gives you the confidence and intelligence you need to ensure clients are staying on the path to recovery.



When drug testing in a criminal justice program, mistakes simply cannot be made. It is important that a drug test is not subjective and follows a process certified by toxicologists. Averhealth understands the importance of accurate and reliable drug testing. All samples are tested at the Averhealth laboratory, which is led by Ph.D. and viding you with the highest standards of accuracy and

"accreditation by College of American Pathologists"

The Averhealth laboratory is one of only 30 domestic labs with accreditation by College of American Pathologists-Forensic Drug Testing (CAP-FDT). This accreditation requires a very comprehensive inspection, with a long list of criteria including, a robust chain of custody, collections, accessioning, screening, confirmation, safety, personnel, and facilities. The Averhealth laboratory is also accredited by the U.S. Department of Health and Human Services Clinical Laboratory Improvements Amendment (CLIA) and the Drug Enforcement Agency (DEA). The laboratory and testing procedures are routinely reviewed by the agencies that Averhealth holds accreditation with and undergoes additional inspections throughout the year.

119.    According to the Internet Wayback Machine, the Averhealth web page shown above that boasted about its CAP accreditation (*see* Paragraph 30) contained that same message throughout the period of Averhealth's probation. Here it is from February 25, 2021:[24]



120.    Averhealth did not contest CAP's findings or CAP's placement of it on probation. Nevertheless, it has not taken the slightest step to make amends to those whose tests it conducted while it was violating CAP's standards. It did not even inform the thousands of clients whose samples it tested during that period that it had been found to have performed their tests improperly.

### 4. The State of Michigan's Suspension of Averhealth for Improper Testing Practices

121.    This section of the Amended Complaint is primarily based on information and belief from documents produced by the Michigan Department of Health and Human Services

---

[24] https://web.archive.org/web/20210225134301/https://averhealth.com/our-laboratory/ (accessed 1/17/2023); *see also* the identical pages from April 10, May 5 and June 16, linked at https://web.archive.org/web/20210415000000*/https://averhealth.com/our-laboratory/ (accessed 1/17/2023).

("MDHHS") in response to requests under the state's Freedom of Information Act ("FOIA"). Here is a summary of what those documents show, with more detail in the subsections below:

122. After entering into a five-year contract with Averhealth beginning in May 2019 for drug testing services in child-custody proceedings, MDHHS suddenly stopped utilizing Averhealth's testing services in March 2022 because of Averhealth's improper testing practices. Among other reasons for the Department's actions, Averhealth had been violating national accreditation standards, leading the Michigan Attorney General and the United States Department of Justice to investigate Averhealth for medical fraud. That fraud was allegedly directed against federal funds used to finance Averhealth's tests. MDHHS also decided that it could no longer – and therefore would no longer – rely on any Averhealth result that it had ever received.

123. MDHHS's contract had made Averhealth the sole provider of drug testing services for MDHHS from May 15, 2019, through August 31, 2024. These tests were conducted on parents for use in child welfare proceedings by the MDHHS's Children's Services Agency ("CSA") to enable the state to decide whether to remove children from their parents' homes.[25]

124. The value of Averhealth's contract with the MDHHS was more than $27.3 million. Ex. 124-A at App. 152-153.

125. While Averhealth realized millions in annual revenues from its contract with MDHHS, the Department itself realized substantial savings with Averhealth compared to its previous drug testing company, Forensic Fluids Laboratories ("FFL"). On an apples-to-apples

---

[25] According to MDHHS documentation, the samples tested on Michigan residents were collected by MDHHS staff, private agency foster care staff, collectors in third-party "brick and mortar" locations, and third-party mobile collectors, but not Averhealth employees. Ex. 124-B, App. 154 at 155. Thus, Averhealth's improper collection practices do not appear to have affected the Michigan results (discovery may show otherwise). But its improper testing practices did.

basis, MDHHS estimated that it was saving $768,318 *per year* compared with what it would have spent if it had continued with FFL. Email from Amanda Doane, 2/9/20. Ex. 125 at App. 161. Thus, MDHHS had a significant financial incentive to support Averhealth against accusations of improper testing practices.

126.    After Averhealth's service for MDHHS began, concerns arose – especially among the state's judiciary – that Averhealth's tests were unreliable and that it was reporting false positives. In the Fall of 2020, many judges refused to accept Averhealth's results. Those concerns increased after one judge reported on a phone call he had had with Dr. Riley about Averhealth's improper testing practices.

127.    At least in their internal communications and after hearing Averhealth smear Dr. Riley as a disgruntled former employee spreading lies, MDHHS's officials said they disbelieved her. However, MDHHS never communicated with Dr. Riley directly to learn from her the basis of her allegations. Moreover, although Averhealth and MDHHS officials repeatedly called Dr. Riley a "disgruntled former Averhealth employee" or the like, they never said what she was disgruntled about; in fact, assuming she was "disgruntled," the cause was Averhealth's refusal to change its improper testing practices when she brought them to its attention.

128.    Nevertheless, in response to complaints about Averhealth from the judiciary, MDHHS told the judges that MDHHS would pay for tests by alternative services (as it did for Averhealth tests) and that MDHHS would investigate the claims against Averhealth.

129.    MDHHS contracted with toxicology consulting firm Wagner Toxicology Associates ("Wagner") to audit Averhealth's lab practices. Internally, however MDHHS made clear that, even before receiving Wagner's report, it intended to return to Averhealth as its sole drug testing service, raising the implication that Wagner's conclusions were pre-ordained.

130.    After MDHHS suspended Averhealth in 2022, at least one MDHHS official questioned whether Wagner had been biased or worse.

131.    In fact, Wagner conducted an abbreviated assessment compared with what it told MDHHS it would conduct and, on February 28, 2021, essentially whitewashed Averhealth in a report that, as described more fully below, was so deeply flawed that it cannot be used as a basis to conclude that Averhealth's tests were reliable. To the contrary, the *facts* reported by Wagner, as opposed to its supposed conclusions, demonstrate that Averhealth's practices were unsound.

132.    Nevertheless, after receipt of the final Wagner report, MDHHS restored Averhealth as its sole drug testing service and continued to save money compared to its previous provider.

133.    However, some Michigan judges were still dissatisfied and persisted in refusing to accept Averhealth's test results in their courts.

134.    Then, in June of that year, the state's Attorney General's office informed MDHHS that, along with the U.S. Attorney's Office for the Eastern District of Michigan, it was investigating Averhealth for medical fraud based on Dr. Riley's allegations. MDHHS cooperated with that investigation and provided information to the investigators.

135.    MDHHS communicated with representatives of the Michigan Attorney General's office and the U.S. Attorney's office in emails beginning in January 2022, that were produced in redacted form in response to a Michigan FOIA request. Thus, Plaintiffs do not know exactly what was said in those emails.

136.    However, on March 7, 2022, a few days after MDHHS's and CSA's top officials met regarding Averhealth with attorneys from the Attorney General's fraud division and an Assistant U.S. Attorney, MDHHS suddenly and with no public warning suspended Averhealth's

services for 90 days because of its failure to follow national accreditation standards and the investigation of it for medical fraud by the Michigan Attorney General and the United States Department of Justice. It also refused to rely any longer on any past test results provided by Averhealth from the beginning of its contract.

137.     At the end of those 90 days, MDHHS extended the suspension for another 90 days. When that period expired, MDHHS made Averhealth's suspension permanent. Averhealth no longer provides drug testing services for MDHHS.

138.     These events are laid out in more detail below.

### a.  MDHHS's 2021 investigation that erroneously upheld Averhealth's practices

139.     To understand MDHHS's suspension of Averhealth, it is necessary to start with the earlier investigation that MDHHS conducted in response to allegations regarding Averhealth's testing practices, an investigation that erroneously concluded that those practices were sound and reliable.

### i.  *Concerns are raised over the accuracy of Averhealth's testing, including by Michigan's judges*

140.     After Averhealth began drug testing under its contract with the MDHHS, concerns were raised about the accuracy of its results (along with other issues such as turnaround time for test reports, missing reports, lack of local administrators to collect samples, and unavailability of witnesses to testify in support of test results).

141.     In the Fall of 2020, MDHHS conducted a survey of its staff and the courts regarding their experiences with Averhealth. A report on the results noted that, in response to an open-ended question asking about concerns based on personal experience, "[c]ourts and attorneys have identified concerns regarding accuracy of the screening results." Averhealth

Caseworker Survey, Ex. 141-A, at App. 164. Specifically, according to a graph summarizing the results, nearly 30% of all respondents said they were concerned about Averhealth's accuracy. Averhealth Responses, Ex. 141-B, App. 170.

142.    So serious were those concerns that many Michigan judges stopped accepting Averhealth's test results. For example, a court administrator in Kalkaska County asked an MDHHS employee in September 2020: "Have you heard much about … accuracy issues? Judge Buday is hearing from other judges in other Court[s] that they are finding the results unreliable." Email from Jeffrey Wilson, September 25, 2020, Ex. 142, at App. 171-172.

> Hi Kris,
>
> Regarding the email below, the Kalkaska court administrator is now inquiring about false positives from Averhealth testing, as our judge has heard other counties are having a problem. Specifically, she is questioning:
>
> "Have you heard much about there be accuracy issues? Judge Buday is hearing from other Judges in other Court that they are finding the results unreliable?"

143.    Similarly, that same month according to an MDHHS Program Manager in Monroe County, judges there felt "that the Averhealth drug screens are inaccurate and give false positives. It is at the point where they are telling parents to go get a second drug test to prove they are drug free. On more than one occasion this has caused the Court to 'throw out' the Averhealth screens as being inaccurate and using the results of the parents private screens to make their decision." Email from Teresa Marshall, September 17, 2020, Ex. 143, at App. 176.

> **From:** Marshall, Teresa (DHHS) <MarshallT@michigan.gov>
> **Sent:** Thursday, September 17, 2020 2:36 PM
> **To:** Westergard, Brooke (DHHS) <WestergardB@michigan.gov>; Strong, Janien (DHHS) <StrongJ1@michigan.gov>
> **Cc:** Needham, Linda Sue (DHHS) <NeedhamL@michigan.gov>
> **Subject:** Concerns with Averhealth Drug Screens
>
> I wanted to bring your attention to an issue shared with us by the Monroe County Juvenile Court jurists. They voiced that they feel that the Averhealth drug screens are inaccurate and give false positives. It is at the point where they are telling parents to go get a second drug test to prove they are drug free. On more than one occasion this has caused the Court to "throw out" the Averhealth screens as being inaccurate and using the results of the parents private screens to make their decision.

144.    Also in September 2020, a Tribal Court refused to consider positive results on Averhealth tests because of false positives reported downstate. Email from Lisa Garcia, 9/24/2020, Ex. 144 at App. 178.

145.    In November 2020, Judge Terence Ackert emailed other judges and MDHHS officials with the ominous subject, "Urgent: Significant Development with Averhealth Drug Testing." He reported that Dr. Riley had called him and stated, in part:

> Dr. Riley informed me that last night she terminated her position as Lab Director with Averhealth because of her serious concerns that Averhealth has failed to follow standard testing procedures and is not compliant with the standards developed by the College of American Pathologists. …
>
> The basis of her complaint, and the concern she raised with me, is that Averhealth does not follow the standard quality control procedures when conducting a test and reporting the results to the client. …
>
> Dr. Riley states that in certain circumstances the failed procedures can create a false positive, especially with cocaine, in approximately 30% of the tests. The frequency of a false positive could, in some instances, increase to 50%.
>
> I considered Dr. Riley's statements and her tone during our conversation to be credible. I was not left with the impression that she was a disgruntled employee or had some "axe to grind."

Email from Judge Terence Ackert, November 4, 2020, Ex. 145 at App. 181.

146.    Judge Ackert also reported that Dr. Riley had "filed a formal complaint against Averhealth with the College of American Pathologists" ("CAP"), Averhealth's accrediting body, *Id.*

147.    As Amanda Doane, the MDHHS employee who oversaw the Averhealth contract, later described it, "this caused a huge crisis within MDHHS." Email from Amanda Doane, 10/25/21, Ex. 147, at App. 183.

148.    Two days after Judge Ackert's report, on November 6, 2020, Judge Thomas P. Boyd, State Court Administrator, wrote on behalf of the State Court Administrative Office ("SCAO") to the state's Family Court Judges about "Concerns Raised Regarding Averhealth Drug Test Reports." He stated, "MDHHS is currently investigating these allegations." Memorandum by Thomas P. Boyd, dated 11/6/2020, Ex. 148 at App. 207. The SCAO is the body that provides guidance and support to Michigan's trial courts statewide.[26]

149.    Judicial rejection of Averhealth's results continued. On November 10, 2020, the Midland County Probate Court issued an order that, because of "significant questions regarding the reliability of Aver Health [*sic*]," an alternative lab would henceforth be used in child protection cases. Blanket Order Regarding Substance Use Testing for Midland County Child Protection Cases, issued 11/10/20, Ex. 149, App. 208-209.

150.    Similarly, on November 16, 2020, because of "significant questions regarding the reliability of Aver Health [*sic*]," Judge Elwood L. Brown of the Probate/Family Division in St. Clair County "order[ed] that substance abuse testing in child protective cases be conducted by a laboratory other than "Aver Health [*sic*]." Blanket Order Regarding Substance Use Testing for St. Clair County Child Protective Cases, dated 11/16/2020, Ex. 150, at App. 210.

---

[26] https://www.courts.michigan.gov/administration/offices/scao-main/ (accessed 12/9/2002).

151. MDHHS, which continued to support Averhealth, feared that many other courts would enter similar orders. On November 16, 2020, Colin Parks, the State Manager of MDHHS' Children's Protective Services ("CPS") responsible for ensuring the integrity of CPS programs[27], wrote Demetrius Starling, then State Bureau Administrator, Bureau of In-House Services (and later CSA Executive Director), "Unfortunately, this may be happening with many of our courts in the coming days. Hopefully, this is for the short term, but time will tell." Email from Colin Parks, 11/16/2020, Ex. 151 at App. 212. (CPS is the state agency responsible for investigating allegations of child abuse and neglect.)

152. Shortly thereafter, the Oscoda County Court announced it would not accept Averhealth's test results, Ex. 152 at App. 213.

153. Shayne Machen, MDHHS's Special Advisor to the CSA Director, described the state's judges' dissatisfaction with Averhealth in a report on a meeting December 9, 2021, of the Child Welfare Leadership Workgroup. This group consisted of state court judges, a tribal court judge and SCAO staff. She said, "[T]here was a lot of discussion about Averhealth and judges expressed frustration over past false positives and newer concerns about (allegedly) inconsistent responses." Email from Shayne Machen, 12/13/21, Ex. 153 at App. 214-215.

### ii. *MDHHS responds to the courts' concerns*

154. MDHHS told the courts that it took those concerns seriously and accordingly that it would pay for tests by other testing services, similar to its payments for Averhealth tests. In a memo to State Court Administrator Boyd, Family Court Judges, Tribal Court Judges, and involved stakeholders, JooYeun Change, then the Executive Director of CSA, wrote:

> We share with you a commitment to have accurate and reliable testing results and information upon which to make critical decisions. We recognize the importance of valid and reliable testing results on the court's ability to issue fair and

---

[27] https://www.linkedin.com/in/colin-parks-9675b916/ (accessed 11/1/2022).

defensible decisions and orders, and how critical those decisions are to the children and families we serve. We will thoroughly assess and resolve the concerns raised to the satisfaction of our court partners, appointed attorneys, field staff, and parents.

***

In the time it takes us to resolve these concerns, if a court is not confident in the Averhealth tests, the court may utilize sample collection and testing through another local vendor and MDHHS will arrange to pay for the alternative testing.

Memorandum dated 11/13/2020, Ex. 154-A at App. 217-218. On November 20, 2020,

MDHHS issued a formal "Communications Issuance" allowing its staff to use alternative

laboratories while it resolved the concerns. Communications Issuance 20-145, Ex. 154-B,

App. 219-220.

155.     Privately, however, MDHHS staffers in charge of administering the testing

program were in contact with Averhealth and, presumably as a result of misinformation

Averhealth gave it, stated, with no equivocation, that they believed that Dr. Riley's allegations

were false and unfounded.

156.     To be sure, the day that Judge Ackert reported on his conversation with Dr. Riley,

Stacie Bladen, CSA Deputy Director, wrote: "We may be headed toward ending this contract.

Not sure. Will doing [*sic*] further investigation." Email from Stacie Bladen, 11/4/20, Ex. 156 at

App. 224. However, the next day, Colin Parks, one of the MDHHS officials most closely

involved with Averhealth, responded in reference to "the process that Dr. Riley and Judge Ackert

have brought to our attention" and stated, "Following our consultation with Averhealth, our

office is confident that the process for testing and retesting meets, or exceeds contract

requirements and industry standards." Email from Colin Parks, 11/5/20, *id.* at App. 222-223.

157.     Mr. Parks sent his email to Jason Herzog, Averhealth CEO, for his approval. Mr.

Herzog made no substantive comment (other than to approve a minor edit made by Dominique

Delagnes, Averhealth's Chief Operations Officer), but he proceeded to smear Dr. Riley's qualifications by asking that Mr. Parks "change Dr. Riley to Sarah Riley." Email from Jason Herzog, 11/5/20, *id.* at App. 221-222.

158.     Asked by Mr. Parks whether she was in fact a doctor, he said (with a copy to Amanda Doane, the MDHHS employee who oversaw the Averhealth contract), "She is, and maybe I'm being petty, but I don't think she merits the title." Email from Jason Herzog, 11/5/20, *id.* at App. 221. Showing that he had bought into Mr. Herzog's insult of Dr. Riley, Mr. Parks responded, "Too funny. Sarah Riley it is." Email from Colin Parks, 11/5/20, *id.* Here is a screenshot:



159. Thereafter, MDHHS employees privately expressed the view that Dr. Riley's allegations were false and, in their emails, never called her "Dr. Riley" and often not even "Sarah Riley," but merely "disgruntled employee" or the like and accused her of spreading lies.

160.    For example, on November 13, 2020, Amanda Doane, the individual within MDHHS who oversaw the Averhealth contract, referred in an email sent to other MDHHS employees to "a disgruntled employee calling a judge and giving false information." Email from Amanda Doane, 11/13/2020, Ex. 160 at App. 228.

161.    That same day, Demetrius Starling – at the time acting Bureau Director over CPS-In Home and later CSA Executive Director – wrote to colleagues, "We have determined that the complaint filed by the worker who resigned from Averhealth is not accurate." Email by Demetrius Starling, 11/13/20, Ex. 161, at App. 229. Mr. Starling did not explain how he, a non-scientist, had made that determination. At the time, MDHHS had no information on Averhealth's practices other than what Averhealth had told it.

162.    On November 17, 2020, Mr. Parks wrote that CSA wanted to continue with Averhealth: "The concerns of the court surround confidence in the testing process and, I believe to some extent, confidence in the company itself. Our goal is to maintain the contract, but to listen to the concerns of the court and consider amendments to the contract that may address/resolve those issues." Email from Colin Parks, 11/17/20, Ex. 162 at App. 230. Documents produced by MDHHS, however, contain no reference to *any* specific contract amendment that could possibly alleviate judges' concerns about Averhealth's testing process – certainly Averhealth never proposed one – and it is hard to imagine an amendment that would do that.

163.    On December 2, 2020, Ms. Doane referred to "the misconceptions surrounding Averhealth." Email from Amanda Doane, 12/2/2020, Ex. 163 at App. 231.

164.    The following day, December 3, 2020, Ms. Doane wrote to Mr. Parks: "I had a group video call today with the judge from Calhoun County along with prosecutors, family

46

attorneys, DHHS staff and Averhealth. All questions were asked and answered and I believe the judge will stay with Averhealth." Email from Amanda Doane, 12/3/20, Ex. 164 at App. 232.

165. This was welcome news to Mr. Park. He wrote back: "Nice work, superstar!" Email from Colin Park, 12/3/20, *id*. See this screenshot:



```
From:       Parks, Colin (DHHS)
To:         Doane, Amanda (DHHS)
Subject:    RE: BSC 3: Forensic Fluids *Immediate response
Date:       Thursday, December 3, 2020 1:10:32 PM

Nice work, superstar!

From: Doane, Amanda (DHHS) <DoaneA@michigan.gov>
Sent: Thursday, December 3, 2020 1:43 PM
To: Parks, Colin (DHHS) <ParksC@michigan.gov>
Subject: RE: BSC 3: Forensic Fluids *Immediate response

I had a group video call today with the judge from Calhoun County along with prosecutors, family
attorneys, DHHS staff and Averhealth.  All questions were asked and answered and I believe the
judge will stay with Averhealth.

Amanda
```

166. Again, on December 15, 2020, in an email to various MDHHS employees, outside attorneys, and others, Ms. Doane referred to "the false allegations made by a past employee." Email from Amanda Doane, 12/15/2020, Ex. 166 at App. 235.

### iii. *MDHHS begins to investigate Averhealth*

167. At the same time, MDHHS began to investigate these complaints. Among other steps, on November 24, 2020, it asked Jason Herzog, Averhealth's CEO, to provide it with Dr. Riley's contact information and the complaint she had filed with CAP. Email from Colin Parks, 11/24/2020, Ex. 167 at App. 246.

168.     Mr. Herzog refused to provide Dr. Riley's contact information. Email from Jason Herzog, 11/30/20, *id.* at App. 221-222. In lieu of forwarding Dr. Riley's complaint, he sent "correspondence we received from CAP regarding Ms. Riley's false allegations." *Id.* at 222.

169.     There is no indication in the FOIA documents that MDHHS made any effort to locate Dr. Riley on its own, for example by conducting a Google search. Currently, a simple search for "Sarah Riley toxicologist" will turn up her web page at Saint Louis University.[28] Instead, without ever speaking with Dr. Riley, MDHHS's employees continued to accuse her of lying about Averheath's practices.

### iv.     Averhealth attempts to defend itself

170.     On December 1, 2020, Mr. Herzog sent two MDHHS employees a memo purporting to defend Averhealth's practices and asking that MDHHS end its investigation and exonerate Averhealth. Memo of Jason Herzog to Colin Parks and Amanda Doane, December 1, 2020, Ex. 170, App. 249-252 ("Request for Exoneration").

171.     In his Request for Exoneration, he stated that Averhealth had conducted an internal investigation of the allegations in the CAP complaint. He stated that "mass spectrometry testing has since been conclusively refuted" (*sic*; presumably he meant that the *allegations* regarding mass spectrometry testing had been refuted), that there were "no issues with following procedures or instrument calibration," and that "Dr. Glinn has since completed the reviews of quality control results and fortunately there were no issues." *Id.* at App. 250.

172.     However, he provided no facts to support any of these conclusory statements and did not mention that CAP's investigation was ongoing. The only fact he offered was that CAP

---

[28] *See* https://www.google.com/search?q=sarah+riley+toxicologist&rlz=1C1CHBF_enUS977US977&oq=sarah+riley+toxicologist&aqs=chrome..69i57j33i160l2.6189j0j15&sourceid=chrome&ie=UTF-8, which returns the following page as the first link: https://www.slu.edu/medicine/pathology/faculty/riley-sarah.php. (both accessed 1/25/2023).

had inspected Averhealth years in the past, "on April 12, 2016, March 15, 2018 and February 7, 2020" and "concluded with glowing remarks" (which he did not quote). *Id.* at App. 250. This was hardly an exonerating fact because, if it were, CAP would not have sent its November 11, 2020, letter asking that Averhealth submit detailed information supporting the validity of its practices against Dr. Riley's allegations.

173.     MDHHS did not accept Mr. Herzog's invitation to end its investigation.

### v.     *MDHHS hires Wagner Toxicology to audit Averhealth's practices*

174.     Instead of immediately exonerating Averhealth, MDHHS hired Wagner Toxicology Associates, a consulting firm in Oklahoma headed by Dr. Jarrad Wagner, to provide an assessment of Averhealth's lab. The Wagner firm reviewed Averhealth's lab practices and submitted an audit report prepared by Dr. Wagner and a colleague, Dr. Larry Broussard. (Hereinafter, Wagner Toxicology Associates is referred to as "Wagner" and Dr. Jarrad Wagner as "Dr. Wagner").

175.     However, despite hiring Wagner to conduct a supposedly independent assessment, MDHHS always intended to return to Averhealth as its sole drug testing service. Colin Parks admitted as much in a memo entitled "Transition Planning," which he sent to MDHHS colleagues as he was about to move to new job responsibilities in March 2021. Referring to the judges' concerns about Averhealth's reliability, Mr. Parks wrote: "Those concerns resulted in guidance to the field/court, allowing for testing to be completed by alternative labs, until the report by Wagner/Broussard was complete. . . . The intent was always to return to Averhealth as the sole tester for the state . . . ." Memo entitled "Transition Planning," Ex. 175-A at App. 253-261, transmitted by email from Colin Parks, 3/5/21, Ex. 175-B, App. 262.

Mr. Parks did not explain how, in light of that intention, the Wagner assessment was anything other than pre-ordained.

176.    Before Wagner conducted its examination, Dr. Wagner emailed Mr. Parks to describe his protocol to "audit [Averhealth's] testing process to make sure that they are performing appropriate testing."

177.    Dr. Wagner said his audit would consist of three aspects, a review of records of test results over the past year, a site visit to Averhealth's St. Louis laboratory to observe its testing, and a review of the laboratory's manuals.

178.    Regarding the review of records, Dr. Wagner stated:

> We will ask for a list of test results in the past year or so, then select about 10 samples per month (80% positive) to review. We will identify the files we want to view so that the lab can assemble any and all supporting data with the reports, and we will verify that the data support the report. All specimens audited should have screening results and since some are positive we should see confirmation data. We will need to see some positives for each class being reported.

Email from Jarrad Wagner to Colin Parks, dated 12/8/2020, Ex. 178 at App. 263.

179.    In addition, Dr. Wagner said that he and Dr. Broussard would conduct a two-day laboratory site visit to observe the personnel's practices and review Averhealth's lab manual to make sure the laboratory was "doing exactly what their lab manual says they are doing." *Id.*

180.    MDHHS issued a State of Michigan Procurement Statement of Work Contract Activities that included these aspects of the protocol. Dr. Wagner's description of his projected audit of past test results based on written records was included nearly verbatim:

> Ask for a list of test results in the past year or so, then select about 10 samples per month (80% positive) to review.  Will identify the files to view so that the lab can assemble any and all supporting data with the reports, and will verify that the data support the report.  All specimens audited should have screening results.

Schedule A – Statement of Work Activities, Ex. 180 at App. 266.

### vi.    *Wagner issues a flawed report*

181.    Drs. Wagner and Broussard conducted their site visit of the Averhealth laboratory on January 19-20, 2021.

182.    In their final report, dated February 28, 2021 ("Wagner Report"), the authors upheld the validity of Averhealth's testing and expressed disagreement with the opinions of Dr. Riley. Although they identified some concerns, the report's conclusion stated: "The team feels that the items of concern expressed in this report do not indicate that the laboratory has reported any false negative or false positive results. The team is confident that the observed data was forensically and scientifically defensible in a court of law."[29]

183.    However, that report was severely flawed for several reasons and, far from supporting a clean bill of health for Averhealth, it indicates that the laboratory had been following improper procedures and that it was impossible to conclude that the results Averhealth had reported were accurate.

184.    First, the Wagner Report's conclusions were based only on the authors' review of the laboratory's manuals, their observations in the laboratory – in which the laboratory personnel obviously knew they were being observed and could therefore adjust their practices accordingly – and only "[a] relatively small number of reports" of past tests. Wagner Report at 3 (Executive Summary).

185.    Contrary to Dr. Wagner's protocol, the Wagner Report did not indicate that they had obtained a list of test results in the past year, requested or obtained 10 samples per month, or

---

[29] This report is available on the internet at https://www.courts.michigan.gov/SysGlobalAssets/migrated/administration/scao/documents-(lisa-and-deb-review)/family-probate/averhealthreport.pdf (accessed 12/23/2022). Note that table of contents is inaccurate and does not refer to section of the report entitled, "Concerns Raised by the Judiciary."

reviewed the supporting data with the reports so that they could attempt to "verify that the data supported the report."

186.    Instead, the authors stated that, before the visit, they were provided *10 random reports* (not 10 per month). Wagner Report at 6.

187.    Still, the authors found significant problems in those few records.

188.    One was that "some analytes were reported that were being flagged as outside identification criteria by the analytical software in use, MultiQuant." *Id.* They stated that this "wasn't *necessarily* an issue, since it was not known how MultiQuant was setup to flag outliers prior to the site visit." *Id.* (emphasis added).

189.    However, during the site visit, they did learn how MultiQuant had been set up, and based on what they learned, Averhealth should not have been reporting some or all of the analytes it reported.

190.    Specifically, the authors noted that, during the site visit, they recommended that MultiQuant be "setup with identical acceptance criteria to the SOP [Standard Operating Procedures]." Wagner Report at 6. Apparently, that had not been done before the visit. They then stated, "Analytes that do not meet these criteria should not be reported." *Id.*

191.    The authors did indicate that "[i]t is the understanding of the site visitors that Averhealth has *now* clearly defined the acceptance criteria for identification of analytes and is using them while reporting results." *Id.* (emphasis added). However, assuming that this change was in fact made (the authors don't say what their understanding was based on), nevertheless their statement that "[a]nalytes that do not meet these criteria should not be reported" means that Averhealth should not have been reporting any analytes before the change; the reason for that is that those criteria did not exist before the change.

192.     Another one of Wagner's concerns was that if Quality Control ("QC") values were outside the normal range, "the laboratory might change the linearity model or internal standard used for a specific analyte." *Id.* This is similar to the QC concern raised by Dr. Riley. The authors said that "this practice would need to be supported by method validation to be acceptable . . . ." *Id.* However, they did not indicate that any such method validation had *ever been conducted*. Without it, the authors had no basis to conclude that this was an acceptable practice, and Averhealth had no basis to report results based on this method.[30]

193.     Yet another concern, in Wagner's words, was "a prior incident in which there were 13 'false positives' reported.  Basically, in a prior batch the vials were put in the autosampler *in the wrong location*, causing 13 results to be associated with the wrong donors." *Id.* at 7 (emphasis added).

194.     The authors indicated that this was the result of human error and that, after discovering it, the lab had "added independent sequence and vial checks that are currently in place, and in the opinion of the inspectors are sufficient to prevent a similar occurrence in the future." *Id.* They did not describe those checks, so there is no basis to conclude that they were correct that these "independent checks" would prevent similar occurrences in the future.

195.     Be that as it may, this incident indicates that the lab had not *previously* used such checks to prevent these occurrences. Nevertheless, Wagner did not conduct any investigation to

---

[30] The textbook *Principles of Forensic Toxicology* devotes a whole chapter to method validation. *See* Justin M. Holler and Shawn P. Vorce, *Method Validation in Principles of Forensic Toxicology* at 229-240. It states: "Method validation in forensic toxicology is a critical component to ensuring quality results. . . . All testing aspects of the laboratory need to be validated including initial and confirmatory testing procedures. . . . Method validation responsibility is part of the quality assurance (QA)/quality control (QC) programs in forensic laboratories." *Id.* at 231, 232. A standard of the American National Standards Institute governs method validation. It states: "The fundamental reason for performing method validation is to ensure confidence and reliability in forensic toxicological test results by demonstrating the method is fit for its intended use." ANSI/ASB, *Standard Practices for Method Validation in Forensic Toxicology* (First Edition 2019) at 2, available at https://www.aafs.org/sites/default/files/media/documents/036_Std_e1.pdf (accessed 2/20/2023). That obviously cannot be done without method validation.

determine whether any such errors had previously occurred and did not report that Averhealth

had ever conducted such an investigation itself. Nor did the authors investigate how this error

had occurred on this one occasion.

196.    If this type of human error occurred once, there is no assurance that it didn't occur

on other occasions, especially without knowing how it happened that one time. Yet the authors

did not investigate that question and, instead, improperly gave short shrift to this issue.

197.    In sum, although the authors indicated that their review of records would be

designed to "verify that the data support the report," they did not conduct any such verification.

They did not verify that the laboratory hadn't been reporting inaccurate results.

198.    Moreover, although in their Conclusion, the authors stated that the laboratory's

methods were appropriate despite these concerns, they did not purport to provide any basis for

that conclusion.

199.    For example, they did not explain how the test results could be regarded as valid

if the laboratory had not validated its method of changing its linearity model or internal standard

where a QC result was outside the normal range.

200.    Nor did they explain how they could conclude that the flagging of analytes as

outside identification criteria by MultiQuant wasn't a defect before their site visit given their

statements that "[a]nalytes that do not meet these criteria should not be reported" and that they

did not know the acceptance criteria in the pre-visit Multiquant setup. *Id.*

201.    Similar problems infected the author's refutation of Dr. Riley's opinions. Before

explaining why that is, it is important to note that the initial Wagner report, labeled "Draft," did

not mention Dr. Riley's allegations. *See* Ex. 201, App. 277-284. Dr. Wagner actually did not

learn of those allegations until after he had submitted a draft of the report, dated February 8,

54

2021. Apparently, Averhealth kept Dr. Riley's allegations from him, even though those allegations were the instigating reason for hiring him in the first place.

202.    Moreover, when Dr. Wagner learned about Dr. Riley's allegations in general terms second-hand, he expressed his disagreement with her *before he even saw her statements*.

203.    On February 24, 2021, two weeks after the draft report but before he submitted the final report, Colin Parks of MDHHS emailed Dr. Wagner about Dr. Riley's testimony in a Michigan child custody case about what she had witnessed at Averhealth. Mr. Parks wrote that, in a call with judges, Dr. Wagner *had already said* that "Dr. Riley's concerns were (my words) irrelevant and would not impact testing results." Email from Colin Parks, 2/24/21, Ex. 203 at App. 290-291.

204.    In response to that email, however, Dr. Wagner indicated that he had not actually seen Dr. Riley's statements. In fact, he admitted that he could not say at that point whether Dr. Riley's criticisms were founded or unfounded. He wrote: "Are you able to provide me with Dr. Riley's statements? That would allow me to review them and determine if they were founded or unfounded." Email from Jarrad Wagner, 2/24/2021, *id.* at App. 289-290. Therefore, the opinion Dr. Wagner gave the judges that Dr. Riley's concerns would not impact testing results was akin to saying, "Don't bother me with the facts, here's my opinion."

205.    After finally reviewing Dr. Riley's testimony, Dr. Wagner emailed MDHHS on February 25, 2021, that he "did not observe the issues she references." Email from Jarrad Wagner, 2/25/2021, *id.* at App. 287. But he relied only on what he "observed onsite in January and as described in the current SOP for Michigan Oral Fluid confirmations." *Id.* In describing the bases of his disagreement with Dr. Riley, he did not rely on, or even mention, the laboratory's actual practices in the past, as shown in the records he was provided. *Id.* The same is true in the

section he added to his report entitled, "Concerns Raised by the Judiciary," where they said they disagreed with Dr. Riley only on what they "observed onsite in January and as described in the current SOP for Michigan Oral Fluid confirmations."

206. Moreover, in the Executive Summary of their final report, the authors stated regarding concerns raised by the judiciary: "None of the items of concern were observed *during the audit or are valid in the current laboratory practices*." Wagner Report at 3 (emphasis added). Again, they did not opine on whether the concerns were valid based on records of past tests. And of course, they could not opine that those concerns would not arise again in the future when Drs. Wagner and Broussard were not present and the laboratory staff was not being observed.

207. There is another flaw in the Wagner analysis, or at least an incompleteness. The report mentioned Averhealth's accreditation by CAP (Wagner Report at 3), but apparently nobody informed the authors about the CAP investigation based on Dr. Riley's complaint, an investigation that was ongoing at the time of their visit to the laboratory and therefore known by laboratory personnel such as Dr. Glinn. Perhaps ever worse, no one informed them of CAP's decision to place Averhealth's accreditation on probation for violating its accreditation standards. Would the authors conclusions be different if they knew that? There is no way to know.

### vii. *Averhealth attempts to influence MDHHS, the judges and Wagner*

208. Averhealth did not sit idly while courts were expressing their skepticism about Averhealth's tests and while Wagner was conducting its assessment. It waged a campaign to influence the courts, Wagner, and MDHHS.

209. One week after Judge Ackert reported on his conversation with Dr. Riley, Mr. Herzog emailed Judge Ackert directly and sent him "a memo regarding the allegations by Sarah

Riley." He also asked for "a few moments of your time to discuss these events." Email from Jason Herzog, 11/12/20, Ex. 209 at App. 305-306.

210.    In response, Judge Ackert said he would share the memo with the judges in his home county but added, "I believe I should not be involved in communications with AverHealth, and the investigation of this issue must be conducted by DHHS and the State Court Administrator's Office. I will communicate with them on this issue." Email from Judge Terence Ackert, 11/12/20, *id.* at App. 304-305.

211.    Subsequently, Averhealth attended a number of Microsoft Teams meetings with court and MDHHS personnel to defend its processes. Averhealth controlled what the judges were told. On November 13, 2020, before one of those meetings, Mr. Herzog sent Colin Parks and Amanda Doane of MDHHS his talking points "to help avoid potential confusion and ensure clarity of the message." Those talking points defended Averhealth's practices but did not address any specific allegations of Dr. Riley, much less refute them. Email from Jason Herzog, 11/13/20, Ex. 211 at App. 309-310.

212.    On December 1, 2020, as described above, Averhealth sent MDHHS Mr. Herzog's Request for Exoneration, asking MDHHS to end its investigation and clear Averhealth, Ex. 170, App. 249. As noted above, MDHHS declined the request.

213.    Averhealth also attempted to influence Dr. Wagner. On February 26, 2021, two days after Dr. Wagner told MDHHS that he needed to see Dr. Riley's statements, Jason Herzog, Averhealth's CEO, forwarded Dr. Riley's testimony to him, and he then attempted to influence Dr. Wagner's conclusions about it. After summarizing three allegations she made, including that "positive results were reported despite failed quality controls," he stated, "No positive results were allowed to be reported if quality control failed. The Averhealth staff followed these

standard operating procedures at all times." Email from Jason Herzog, 2/26/21, Ex. 213 at App. 333-234. (As noted above, CAP found that the lab did not follow its standard operating procedures. Mr. Herzog did not tell Dr. Wagner that.)

214.    Mr. Herzog was therefore asking Dr. Wagner to accept his self-serving statement over Dr. Riley's sworn testimony based on her first-hand knowledge (and CAP's findings, which Dr. Wagner did not know about). Mr. Herzog did not work in the lab. He was based in Richmond, Virginia, more than 800 miles away. Thus, unlike Dr. Riley, he was reporting on these practices second-hand. Note that this was a month after Drs. Wagner and Broussard had conducted their site visit, where they could have investigated this issue first-hand if they'd known about it.

215.    Averhealth also hired *lobbyists* to try to influence the judiciary. On February 24, 2021, Mr. Herzog emailed MDHHS personnel that "Melissa and Carrie, copied on this email, had a positive conversation with Judge Boyd earlier today." Email from Jason Herzog, 2/24/21, Ex. 215 at App. 351. Here is a screenshot:



**From:** Jason Herzog <jherzog@averhealth.com>
**Sent:** Wednesday, February 24, 2021 12:40 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>; Parks, Colin (DHHS) <ParksC@michigan.gov>; Melissa McKinley <mmckinley@kelley-cawthorne.com>; Carrie Linderoth <clinderoth@kelley-cawthorne.com>; Dominique Delagnes <ddelagnes@averhealth.com>
**Subject:** Boyd Conversation Summary

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Colin and Amanda,

Melissa and Carrie, copied on this email, had a positive conversation with Judge Boyd earlier today.

As mentioned above, Judge Boyd was State Court Administrator and head of SCAO, the body that provides guidance and support to Michigan's trial courts statewide.

216.   As can be seen from the "To" line of the above email, Melissa and Carrie are Melissa McKinley and Carrie Linderoth. They were with the lobbying firm Kelley Cawthorne. That firm promotes itself with this inviting description (at least inviting to businesses seeking to influence government decisions): "Lobbying is more than just politics. It's a professional calling to advance your business and institutional interests. We tailor innovative strategies with proven messaging . . . ."[31] The use of professional lobbyists to influence the judiciary is certainly an "innovative strategy" and is an indication of the steps Averhealth was willing to take to attack Dr. Riley and defend its lucrative business in Michigan.

217.   Averhealth also attempted to influence MDHHS. For example, on February 26, 2021, *while Averhealth was on CAP probation based on Dr. Riley's allegations*, Mr. Herzog wrote several MDHHS employees severely criticizing her. He stated: "The sworn testimony provided by Ms. [*sic*] Riley relies on innuendo and lacks factual data." He then purported to rebut her testimony, for example repeating his assertion that Averhealth's staff always followed its standard operating procedures. He did not mention that CAP had put Averhealth on probation because it had *not* been following those procedures. He also (falsely) denied Dr. Riley's testimony that "she and others submitted concerns to management that were either rebuffed or ignored." Email from Jason Herzog, 2/26/21, Ex. 217 at App. 353-354. Again as noted above, CAP found that this was also untrue.

218.   Most significantly, Mr. Herzog deliberately concealed Averhealth's probationary status with CAP and did not tell MDHHS that CAP agreed with Dr. Riley.

---

[31] https://kelleycawthorne.com/ (accessed 12/21/2022).

219. Averhealth also falsely told MDHHS that CAP had investigated Dr. Riley's allegations in December 2020 and found them unfounded. In March 2021, *again while Averhealth was on CAP probation*, it sent MDHHS promotional slides entitled "MDHHS Update" for a meeting with Mr. Starling and other MDHHS officials. It included a "Timeline of Events" that states that in December 2020 "Averhealth ha[d] a perfect CAP-FDT proficiency test, a rare industry feat."[32] See this screenshot:



Averhealth presentation, MDHHS Update, March 2021, Ex. 219 at App. 368.[33] Again he did not mention that, to the contrary, CAP had agreed with Dr. Riley and, as noted above, had placed Averhealth on probation because it had found Dr. Riley's allegations correct and specifically

---

[32] CAP-FDT is CAP's forensic drug testing accreditation program.
[33] The reference to the conclusions of two organizations in November 2020 apparently refers to whether it was appropriate to forego immunoassay tests, but not to Dr. Riley's allegations regarding issues such as Quality Control and calibration of instruments.

called out Averhealth's proficiency testing as an area with which it was "particularly concerned." Ex. 112 at App. 146.

220.    In an email on January 20, 2021, to an MDHHS colleague questioning Averhealth's accuracy, Ms. Doane wrote that she *had a report of a CAP inspection* "based on the disgruntled ex-employee allegations" and that "all allegations were deemed to be unfounded."

---

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, January 20, 2021 7:20 AM
**To:** Smith, Amy (DHHS) <SmithA41@michigan.gov>
**Subject:** RE: Drug Screens

Our independent assessor team is in St. Louis at the Averhealth lab this week conducting the review. We expect to have the report no later than mid-February.

We also got reports from CAP-FDT and CLIA who did inspections based on the disgruntled ex-employee allegations to the accrediting bodies and to the judge and … all accusations were deemed to be unfounded.  Both accrediting bodies gave Averhealth excellent marks.

As soon as we get the report from our independent assessor we will put everything together in a communication to courts and MDHHS staff with findings.

Amanda

[callout: "got report[] from CAP-FDT"]

---

Email from Amanda Doane, 1/20/21, Ex. 220-A at App. 375.[34] Ms. Doane must have been told about this supposed CAP report from Averhealth because, as noted above, no such report existed so she could not have had one in her possession.

---

[34] CLIA stands for "Clinical Laboratory Improvement Amendments," federal standards applicable to laboratories testing human specimens. The CLIA inspection, conducted by the Department of Health and Human Services, was a standard inspection that did not look at Dr. Riley's allegations, as Colin Parks admitted in an email transmitting the inspection report to Stacie Bladen, Deputy CSA Director. Email from Colin Parks, 1/4/21, Ex. 220-B, App. 378-379. After reviewing the report, which noted a number of deficiencies, Ms. Bladen commented that "the federal findings are concerning." Email from Stacie Bladen, 1/8/21, *Id.* at App. 378.

221.    In fact, a month after saying she *had* a CAP report, Ms. Doane asked Averhealth's COO whether such a report even existed. She said, "Did you ever get the CAP report and submit your response to any issues? If so, can you please send me those?" Email from 2/10/21 (emphasis added), Ex. 221 at App. 381.

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, February 10, 2021 12:22 PM
**To:** Dominique Delagnes <ddelagnes@averhealth.com>
**Subject:** CAP Report?

**EXTERNAL: This email originated from outside averhealth. Do not click any links or open any attachments unless you trust the sender and know the content is safe.**

Did you ever get the CAP report and submit your response to any issues?  If so, can you please send me those?

222.    In response, Dominique Delagnes, the COO, like her boss Mr. Herzog, concealed the fact that Averhealth was on CAP probation. Instead, she stated CAP had not yet concluded its investigation and was not expected to do so for several months. Emails from Dominique Delagnes, 2/10/21, *id.* at App. 380.

**From:** Dominique Delagnes <ddelagnes@averhealth.com>
**Sent:** Wednesday, February 10, 2021 1:13 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Subject:** RE: CAP Report?

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Good afternoon Amanda,

They have the information they initially requested and since our last inspection was a year ago they have opted to come on-site to conduct an inspection to conclusively resolve the matter.

Best,

Dominique

---

**From:** Dominique Delagnes <ddelagnes@averhealth.com>
**Sent:** Wednesday, February 10, 2021 2:39 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Cc:** Parks, Colin (DHHS) <ParksC@michigan.gov>
**Subject:** RE: CAP Report?

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

They have not set a date yet and we expect it to be in the next few months.

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Wednesday, February 10, 2021 1:27 PM
**To:** Dominique Delagnes <ddelagnes@averhealth.com>
**Cc:** Parks, Colin (DHHS) <ParksC@michigan.gov>
**Subject:** RE: CAP Report?

When will they be on-site?

223.    Ms. Delagnes ignored Ms. Doane's query about whether Averhealth had submitted a response to the issues raised by CAP and Ms. Doane's request that, if it had, to send it to her. So far as the Michigan FOIA documents show, Averhealth never sent MDHHS its response to CAP. Nor did it ever deviate from its falsehoods that it had never received less than glowing reviews from CAP, much less admit that CAP believed Dr. Riley's criticisms were so well-founded that they warranted putting Averhealth on probation.

224.    MDHHS never learned about CAP's real conclusions until it received documents directly from CAP on March 25, 2022.

225.    Averhealth's deception regarding its improper testing practices extends into this lawsuit. In support of its motion to dismiss, Averhealth attacked Dr. Riley's opinions as untenable as a matter of law but never mentioned that the scientists of CAP unanimously agreed with her and had placed Averhealth on probation as a result. Memorandum in Support of Motion to Dismiss Complaint, Doc. # 12 at 12-15,

### viii.    MDHHS accepts the Wagner conclusions; judges disagree

226.    As a result of the Wagner Report, MDHHS stated that "**MDHHS staff and private providers should return to full utilization of Averhealth as a testing provider**." MDHHS Children's Services Agency Communication Issuance 21-047, dated 5/24/2021.[35]

227.    On June 4, 2021, Judge Lisa McCormick of the Ingham County Circuit Court Family Division, relying in large part on the Wagner Report and the testimony of Dr. Wagner and Dominique Delagnes, Averhealth's Chief Operations Officer, issued an opinion that the Averhealth results before her were reliable. Dr. Riley also testified in the case, but Judge McCormick rejected her testimony as "speculative." Ex. 227 at App 388.

---

[35] https://micounties.org/wp-content/uploads/OBSOLETE-PI-2021-001-Substance-Use-Testing-CCF-Eligibility-for-Alternate-Provider.pdf (accessed 11/3/2022; emphasis in original).

228.     However, it is clear that the record in that case was woefully incomplete and that her opinion therefore is not an indication that Averhealth engaged in sound practices. First, it does not appear from the opinion that the court heard any testimony regarding the fatal flaws in the Wagner Report. Dr. Riley testified in that case before the final Wagner report was submitted and therefore could not testify about it.

229.     Perhaps even more significant, there was no testimony informing the court that CAP had put Averhealth's accreditation on probation based on its determination that Dr. Riley's allegations were well-founded and that Averhealth's laboratory practices were unsound. The only witness who knew about that was Ms. Delagnes, who testified on February 5, 2021, only a week after that decision. However, Ms. Delagnes, who had been sworn to tell the whole truth, testified that Averhealth was "a CAP-FDT certified laboratory," but did not mention that its certification had been placed on probation. Ex. 229, App. 391-424, testimony of Dominique Delagnes in *In the matter of [redacted]*, File No. 76442-1/2-NA (Thirtieth Judicial Circuit Court, Family Div., Mich.) at 10.

230.     Moreover, both before and after the Ingram County decision, a number of Michigan judges stated that they were *not* satisfied with the Wagner report and continued to reject Averhealth's testing.

231.     For example, on May 27, 2021, after learning that MDHHS had restored Averhealth as sole provider for drug tests, Midland County Judge Doreen Allen wrote, referring to herself and her MDHHS County Director: "We have had ongoing meetings on the Aver Health [*sic*] quality issues for some time. Maybe I have missed something, but I don't remember being asked whether the judiciary was satisfied with the 'investigation'.  I certainly am not. " She

reiterated her Blanket Order rejecting the use of Averhealth's tests. Email from Judge Doreen S. Allen, May 27, 2021, Ex. 231 at App. 426.

232.    As of September 2021, Judge Allen was still refusing to accept Averhealth's testing. Email from Shelly J. Marner, 9/15/21, Ex. 232 at App. 428.

233.    In November 2021, the court in St. Clair County likewise issued an order not to use Averhealth testing. Email from Shelly J. Marner, 11/5/21, Ex. 233 at App. 430-431.

234.    Also that month, SCAO informed MDHHS about additional recent complaints regarding Averhealth. For example, Averhealth had incorrectly told the St. Clair County Court that the medication Adderall could not "show up on a drug screening as amphetamine," a statement that Averhealth later retracted after seeing what another lab had said on the subject. Email from Shayne Machen, 11/17/21, Ex. 234 at App. 432.

| From: | Machen, Shayne (DHHS) |
| To: | Bushinski, Vera (DHHS) |
| Subject: | Averhealth Meeting |
| Date: | Wednesday, November 17, 2021 12:53:00 PM |

Hi Vera,

Can you please add this information to the Averhealth calendar invite:

- Agenda – To discuss recent complaints about Averhealth that have come from SCAO. Specifically, we received documentation that Averhealth incorrectly informed St. Clair County Court that Adderall would not show up on a drug screening as an amphetamine. After seeking testing at another lab, who indicated Adderall *could* show up as amphetamines, Averhealth retracted their statement and agreed with the second lab. Second, in Cheboygan County during testimony at a child welfare hearing, Averhealth staff was not able to answer general questions about the lab results. There are other concerns that Jen Warner is attempting to get more information about. In light of these concerns, the Director would like to meet before our Tuesday meeting with the Justices.

235.     Similarly, Judge Laura A. Frawley, Presiding Probate and Family Court Judge in Alcona County, issued an order on December 13, 2021, that Forensic Fluids Laboratories, not Averhealth, would conduct substance use testing in that court. Judge Frawley wrote:

> In 2019, this Court was appraised of a false positive result in a pending child protection action. Court heard sworn testimony from an Averhealth official and it was represented that quality controls were put into place to ensure that this would never occur again. Despite that, currently there are significant questions regarding the reliability of Averhealth. Many courts throughout the state are continuing to question the reliability of Averhealth tests.

Blanket Order Regarding Substance Use Testing for Alcona County Child Protection Cases, Ex. 235 at App. 435-436.

236.     That same day, Shayne Machen, Special Advisor to the CSA Director, wrote that at a work group meeting attended by state court judges, the judges expressed frustration over Averhealth's "past false positives and newer concerns about (allegedly) inconsistent responses." Email from Shayne Machen, 12/13/2021, Ex. 153 at App. 214-215.

**b. CSA's suspension of Averhealth for improper testing practices**

237.     Although MDHHS and CSA continued to support Averhealth into early 2022, all that changed on March 7, 2022. On that date, CSA suspended Averhealth's testing services for 90 days while it investigated Averhealth's practices. It published a "Communications Issuance" stating that "the Children's Services Agency (CSA) has determined that effective immediately, CSA will discontinue the use of Averhealth for substance use testing. Staff must access other local providers for testing for the next 90 days." MDHHS Communications Issuance 22-025, Ex. 237, App. 439-440 (highlighting in original).[36]

---

[36] That document is available at https://www.courts.michigan.gov/4970ef/siteassets/court-administration/scao-communications/memo-re-drug-testing-in-abuse-and-neglect-cases-following-mdhhs-communication-issuance-22-025.pdf (accessed 11/4/2022).



| | Subject/Title | Substance Use Testing |
|---|---|---|
| | Type | ☐Informational Memorandum<br>☒Program Instruction<br>☐Policy Guide |
| **MDHHS**<br>Michigan Department of Health & Human Services | Issuance Date<br>Obsolete Date | 3/7/2022<br>6/6/2022 |
| **Children's Services Agency** | Contact Name<br>Email<br>Phone | Sarah Goad<br>GoadS@Michigan.gov<br>N/A |
| **Communication<br>Issuance** | Due Date<br>Due to | N/A<br>N/A |
| **22- 025**<br>***Revised** | *Distribution* | ☒ CSA Central Office Managers/Staff<br>☒ MDHHS BSC and County Directors<br>☒ MDHHS Juvenile Justice Managers/Staff<br>☒ MDHHS Child Welfare Managers/Staff<br>☒ Native American Tribes<br>☐ Office of Workforce Development and Training<br>☒ Private Agency Child Welfare Managers/Staff<br>☐ Private Residential Abuse/Neglect Managers/Staff<br>☐ Private Residential Juvenile Justice Managers/Staff<br>☐ Other: |

The Children's Services Agency (CSA) has determined that effective immediately, CSA will discontinue the use of Averhealth for substance use testing. Staff must access other local providers for testing for the next 90 days.

**Substance Use Testing Liaison**
Each county/district office and private agency provider has established a substance use testing liaison to assist with the substance use contract service. The liaison is responsible for identifying local substance use providers.

Substance use testing liaisons will receive a meeting notice from Amanda Doane by Monday, March 14, 2022, to discuss tracking requirements in greater detail and allow an opportunity for questions to be addressed.

**Court Ordered Drug Testing**
While the local substance use testing liaisons work to set up substance use testing with local substance use testing companies, please work with clients who are court ordered to test to ensure they have the information and resources they need to comply with the court's order.

**Payment and Tracking Process for Substance Use Testing Providers**
The cost of drug testing will be covered by the CSA during this 90-day period.

"next 90 days"

"discontinue the use of Averhealth for substance use testing."

238. On information and belief, this decision was triggered by information provided by attorneys with the Michigan Attorney General's Office and the United States Department of Justice that they were investigating Averhealth for health care fraud and that Averhealth was violating national accreditation standards. That belief is based on emails within MDHHS, as well as between MDHHS and the Department of Justice and the Michigan Attorney General's Office.

68

*i.* ***MDHHS learns of federal and state investigations of Averhealth for medical fraud***

239.　On June 29, 2021, only three months after the Wagner Report purported to exonerate Averhealth, Jason Evans, First Assistant in the Health Care Fraud Division of the Michigan Department of Attorney General, emailed Demetrius Starling, CSA Executive Director, with the Subject "Averhealth drug testing." Email from Jason Evans, 6/29/21, Ex. 239 at App. 444. He stated: "Our office, along with the U.S. Attorney's Office for the Eastern District of Michigan, is investigating fraud allegations related to drug testing performed by Averhealth through a contract with MDHHS.  It appears MDHHS already hired outside experts to investigate the allegations that are the basis of our fraud investigation." Email from Jason Evans, 6/29/2021, Ex. 239 at App. 444. See screenshot below:

> **From:** Evans, Jason (AG) <EvansJ@michigan.gov>
> **Sent:** Tuesday, June 29, 2021 7:12 PM
> **To:** Starling, Demetrius (DHHS) <StarlingD@michigan.gov>
> **Subject:** Averhealth drug testing
>
> Demetrius,
>
> Our office, along with the U.S. Attorney's Office for the Eastern District of Michigan, is investigating fraud allegations related to drug testing performed by Averhealth through a contract with MDHHS. It appears MDHHS already hired outside experts to investigate the allegations that are the basis of our fraud investigation.
>
> Would you be willing to meet with the assigned Assistant U.S. Attorney and I to discuss? If so, do you have any availability next week?
>
> Thanks,
> Jason
>
> Jason Evans
> First Assistant
> Health Care Fraud Division
> Michigan Department of Attorney General
> P.O. Box 30218
> Lansing, MI 48909
> (517) 241-6500

240.    In response, Mr. Starling held a Microsoft Teams meeting on July 9, 2021, with Mr. Evans and Anthony Gentner, Assistant U.S. Attorney for the Eastern District of Michigan, as well as members of his staff. *Id.* at App. 443.

241.    On the day of the meeting, Jennifer Warner, CSA Legal Division Director, wrote Mr. Starling that "this does not appear to be an investigation against you, but more looking for information on Averhealth." Email from Jennifer Warner, 7/9/21, Ex. 241 at App. 446.

242.    No record of what occurred at the meeting is contained in the FOIA documents produced by MDHHS. However, on the day of the meeting, Shayne Machen, Special Advisor to CSA Director Starling, wrote two of her colleagues: "Do we know what case the Averhealth

issue came up in? The US Attorney is requesting a copy of the transcript from that hearing. . . . They are also asking for the dollar amount of SSBG funds we spend annually, for FY 20." Email from Shayne Machen, 7/9/21, Ex. 242 at App. 449.

243. "SSBG" is the Social Security Block Grant Program, the federal program that provides funds to states for service programming, such as those administered by the CSA.[37] The implication is clear. The US Attorney was investigating Averhealth for fraud directed at federal spending.

244. The request for a transcript of a hearing apparently refers to Dr. Riley's testimony. On August 12, Mr. Gentner wrote Ms. Warner, "I was curious if you were able to locate more information on the testimony Dr. Riley appears to have given on February 19, 2021 regarding Averhealth's testing practices, which is cited in the public report. Ideally, we want to see a transcript of the testimony, but any information you have on this would be appreciated." Email from Anthony Gentner, 8/12/2021, Ex. 239, at App. 442.

---

[37] https://www.acf.hhs.gov/ocs/programs/ssbg (accessed 12/15/2022);

**From:** Gentner, Anthony (USAMIE) <Anthony.Gentner2@usdoj.gov>
**Sent:** Thursday, August 12, 2021 12:38 PM
**To:** Evans, Jason (AG) <EvansJ@michigan.gov>; Warner, Jennifer (DHHS)
<WarnerJ19@michigan.gov>
**Subject:** RE: Averhealth Drug Testing

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Thanks for reaching out, Jennifer. Nothing additional to report from me at this time. However, I was
curious if you were able to locate more information on the testimony Dr. Riley appears to have given
on February 19, 2021 regarding Averhealth's testing practices, which is cited in the public report.
Ideally, we want to see a transcript of the testimony, but any information you have on this would be
appreciated. Let me know.

Thanks,
Anthony

By "public report" he apparently meant the Wagner Report. Thus, it is clear that the U.S.
Attorney was not accepting Wagner's conclusion at face value.

245.    The request for the transcript – which included testimony by Dr. Riley – made its
way to Ms. Doane, who wrote a colleague that "now our AG's office is making noises like they
want the transcripts – not just the judge's opinion . . . ." Email from Amanda Doane, 8/23/21, Ex.
245 at App. 450.

246.    On August 12, 2021, Ms. Warner transmitted Dr. Riley's testimony, along with
that of Ms. Delagnes of Averhealth. Email from Jennifer Warner, 8/12/21, Ex. 239, at App. 441-
442.

247.    In response, Mr. Gentner wrote Ms. Warner:

One follow-up question along the same lines: can you confirm how MDHHS first
became aware of the issues raised by Dr. Riley? I see from the testimony that in
February 2021, MDHHS was in the process of investigating and/or hiring
consultants to examine the lab in St. Louis, but the attached memo suggests
SCAO was aware of these issues as early as November 2020. I'm just trying to

understand how Dr. Riley's complaints made it on your radar, and what happened, if anything, during that intervening period.

Email from Anthony Gentner, 8/19/21, Ex. 239, at App. 441.

---

**From:** Gentner, Anthony (USAMIE) <Anthony.Gentner2@usdoj.gov>
**Sent:** Thursday, August 19, 2021 11:46 AM
**To:** Warner, Jennifer (DHHS) <WarnerJ19@michigan.gov>; Evans, Jason (AG)
<EvansJ@michigan.gov>
**Subject:** RE: Averhealth Drug Testing

> **CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Thank you, Jennifer. This is super helpful. One follow-up question along the same lines: can you confirm how MDHHS first became aware of the issues raised by Dr. Riley? I see from the testimony that in February 2021, MDHHS was in the process of investigating and/or hiring consultants to examine the lab in St. Louis, but the attached memo suggests SCAO was aware of these issues as early as November 2020. I'm just trying to understand how Dr. Riley's complaints made it on your radar, and what happened, if anything, during that intervening period.

Separately, we have the Averhealth contract, but is there a way that we can see the RFP that this contact was based on? It's RFP # 190000000633. Forgive me if this information is already available online somewhere; I just couldn't find it.

Thanks,
Anthony

---

248.    Ms. Warner passed on that request to two colleagues. Email from Jennifer

Warner, 8/19/21, Ex. 239, at App. 441. How MDHHS answered Mr. Gentner's request is not

contained in the FOIA documents.

249.    A few months later, on January 26, 2022, Carl Hammaker, Assistant Attorney

General in the Health Care Fraud Division of the Michigan Department of Attorney General,

wrote Ms. Doane, with a copy to Sarah Goad, Manager, Foster Care, Guardianship, and

Adoption Program Office of MDHHS. The Subject was "Avertest d/b/a Averhealth." Email from

Carl Hammaker, 1/26/22, Ex. 249 at App. 467. The substance of that email produced under

FOIA was redacted on grounds of attorney-client privilege. *See* this screenshot:

**From:** Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Sent:** Wednesday, January 26, 2022 4:34 PM
**To:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Cc:** Goad, Sarah (DHHS) <GoadS@michigan.gov>
**Subject:** Avertest d/b/a Averhealth

Ms. Doane,

MCL 15.243(1)(g)

I cc'd your supervisor as reflected on the most recent org chart I was able to find.

If you have questions please feel free to contact me on Teams, my office phone below, or my cell 248-835-6853.

Thanks,
Carl

Carl Hammaker
Assistant Attorney General
Health Care Fraud Division
Michigan Department of Attorney General
P.O. Box 30218
Lansing, MI 48909
(517) 241-6502

250.     The next day Ms. Doane responded: "I am the person who oversees the

Averhealth contract for drug screens within DHHS. Sarah and I will be happy to meet with you

and your team to discuss Averhealth. Can you give me a brief synopsis on what you would like

to discuss so I can be prepared with any documentation I may need?" Email from Amanda

Doane, 1/27/2022, *id.* at App. 466-467.

**From:** Doane, Amanda (DHHS) <DoaneA@michigan.gov>
**Sent:** Thursday, January 27, 2022 7:04 AM
**To:** Hammaker, Carl (AG) <HammakerC@michigan.gov>
**Cc:** Goad, Sarah (DHHS) <GoadS@michigan.gov>
**Subject:** RE: Avertest d/b/a Averhealth

Carl,

I am the person who oversees the Averhealth contract for drug screens within DHHS. Sarah and I will be happy to meet with you and your team to discuss Averhealth. Can you give me a brief synopsis on what you would like to discuss so I can be prepared with any documentation I may need?

Amanda


Amanda Doane

251.     On January 31, 2022, Mr. Hammaker wrote back with a "Synopsis of what is to be discussed on the call." (The actual synopsis is redacted in the document produced under FOIA.) He asked for a meeting in early February. Email from Carl Hammaker, 1/31/22, *id.* at App. 465-466.